BAUSCH & LOMB, INC. AND CONSOLIDATED SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3394-86.     Filed March 23, 1989.

526

*Dennis I. Meyer, C. David Swenson, John W. Polk,* and *A. Duane Webber,* for the petitioners.

*Joseph R. Goeke, James E. Kagy,* and *Helen M. Lokey,* for the respondent.

KÖRNER, *Judge:* Respondent determined deficiencies in petitioners' consolidated corporate Federal income tax in the amounts and for the years as follows:

| TYE | Deficiency |
| --- | --- |
| Dec. 30, 1979 | $5,797,857 |
| Dec. 28, 1980 | 514,141 |
| Dec. 27, 1981 | 2,714,394 |

The determination of petitioners' 1979, 1980, and 1981 United States consolidated taxable income requires a determination as to petitioners' United States consolidated taxable income for the year 1982 due to net operating loss and foreign tax credit carrybacks.

Among other adjustments made by respondent in his statutory notice, respondent determined that income should be reallocated in the amounts of $2,778,000 and $19,793,750 for the years 1981 and 1982, respectively, from Bausch & Lomb Ireland, Ltd. to Bausch & Lomb Inc. pursuant to section 482.[1] Respondent also made correlative adjustments to the income of Bausch & Lomb Inc. of $418,669 and $1,368,000 for the years 1981 and 1982 to eliminate the royalties paid to petitioners by Bausch & Lomb Ireland, Ltd. and deducted on its returns. Thus, respondent made

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure except as otherwise noted.

net section 482 adjustments of $2,359,331 for 1981 and $18,425,750 for 1982.

After concessions, the issues for determination are: (1) Whether respondent's allocations of gross income from Bausch & Lomb Ireland, Ltd., to Bausch & Lomb Inc. were arbitrary, capricious, or unreasonable; and (2) whether an allocation under section 482 is required to clearly reflect petitioners' income.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference.

## I. Introductory information

### A. *Petitioners*

Petitioner Bausch & Lomb Inc. is a New York corporation with principal corporate offices at Rochester, New York, at the time its petition herein was filed. Unless otherwise indicated, as used herein, the term "B&L" shall refer to Bausch & Lomb Inc., as a separate and legal entity. B&L is the parent company of a group of corporations which filed consolidated Federal income tax returns for its tax years ending in 1979, 1980, 1981, and 1982. Unless otherwise indicated, as used herein, the term "petitioners" shall include B&L, as well as its subsidiaries which were included in the above-described consolidated Federal income tax returns. The term "B&L and its subsidiaries" shall refer to B&L and those of its subsidiaries and affiliates which are consolidated for financial reporting purposes, including foreign subsidiaries.

During the years 1979, 1980, 1981, and 1982, petitioners kept their books and records and filed their Federal income tax returns on the basis of an accrual method of accounting, and on the basis of a 52-53 week taxable year.

### B. *Bausch & Lomb Ireland, Ltd.*

Bausch & Lomb Ireland, Ltd. (B&L Ireland), is a corporation organized and existing under the laws of the Republic of Ireland, with its principal place of business at Waterford,

Ireland, during each of the taxable years at issue herein. B&L Ireland was incorporated on February 1, 1980. During the years 1980, 1981, and 1982, B&L Ireland maintained its books and records on the accrual method of accounting, and on the basis of a 52-53 week taxable year.

During each of the taxable years at issue herein, B&L Ireland was a wholly owned subsidiary of Bausch & Lomb Waterford, Ltd. (B&L Waterford). B&L Waterford was incorporated under the laws of the Republic of Ireland on February 1, 1980, as a wholly owned subsidiary of Applied Research Laboratories S.A. (Switzerland) (ARL). ARL was incorporated under the laws of Switzerland on August 19, 1967, and was a wholly owned subsidiary of B&L during each of the taxable years at issue herein.

B&L Ireland was organized by B&L for valid business reasons and to take advantage of tax benefits and other inducements offered by the Republic of Ireland to companies establishing manufacturing facilities within the Republic.

C. *The Business of B&L and its Subsidiaries*

B&L is the outgrowth of a partnership established by J.J. Bausch and Henry Lomb in the 1850's in Rochester, New York. The business operated as a partnership until March 20, 1908, when B&L was incorporated. Since inception, B&L had been involved in the manufacture and sale of a wide variety of scientific and ophthalmic instruments and products.

B&L first entered the contact lens business on a national level in May 1971, when B&L began to manufacture and sell "soft" contact lenses throughout the United States on a commercial basis. B&L produced soft contact lenses at its Rochester facility using both the "spin cast" and "lathing" manufacturing processes. During late 1971 and throughout 1972, B&L and its subsidiaries began to market soft contact lenses in various foreign countries in the Western Hemisphere, Europe, and the Pacific Basin region.

In 1971, B&L established the Soflens Division to conduct its soft contact lens business. Prior to January 1, 1982, petitioners' business with respect to soft contact lenses and products related to soft contact lenses, such as accessories,

solutions, and other related products were managed by the Soflens Division. On January 1, 1982, the Soflens Division was split into two divisions, the Soflens Professional Products Division which subsequently managed petitioners' soft contact lens business; and the Personal Products Division which subsequently managed petitioners' business with respect to accessories, solutions, and other products related to soft contact lenses.

Within the vision care segment of petitioners' business in 1979 and 1980 there were three product areas, (i) contact lens products, consisting of soft contact lenses, accessories, solutions, and insurance, (ii) consumer products, consisting of sunglasses, binoculars, telescopes, and riflescopes, and (iii) ophthalmic products, consisting of eyeglass frames and lenses, and prescription services. In November 1981, B&L discontinued its ophthalmic business, and began to sell all of the assets of such business. Thus, after November 1981 and throughout 1982, the vision care segment of petitioners' business included only contact lens products and consumer products.

During the years 1979 through 1982, B&L and approximately 23 of its foreign subsidiaries sold soft contact lenses in approximately 64 countries.

During the years 1981 and 1982, B&L Ireland was engaged in the manufacture and sale of soft contact lenses which were manufactured at its manufacturing facility in Waterford, Ireland, using the spin cast process.

At the end of 1980, 1981, and 1982, B&L and its worldwide subsidiaries employed approximately 11,800, 10,200, and 7,700 individuals, respectively. The reduction in 1982 in the number of employees of B&L and its subsidiaries was attributable largely to the discontinuation and disposition of B&L's ophthalmic business.

The (i) worldwide consolidated net sales and (ii) the worldwide consolidated contact lens and related products net sales (including solutions, accessories, and other products related to contact lenses) of B&L and its subsidiaries for the years 1979 through 1982 were as follows (000s omitted):

| Year | Worldwide consolidated net sales | Worldwide consolidated contact lenses and related products net sales |
|------|----------------------------------|----------------------------------------------------------------------|
| 1979 | $503,031 | $139,740 |
| 1980 | 582,681 | 176,403 |
| 1981 | 533,300 | 201,600 |
| 1982 | 509,736 | 205,600 |

II. Historical development of the soft contact lens industry through 1982

A. *History of the Contact Lens Industry Prior to the Development of the Soft Contact Lens*

In 1938, a new material known as polymethyl methacrylate (PMMA) was developed. PMMA is a hard, plastic material which is easily shaped into thin dimensions. PMMA's relative safety, lightness, and workability made it a suitable material from which to fashion contact lenses. The first contact lenses had been developed in the late nineteenth century. These contact lenses were made of glass and were extremely uncomfortable. Thus, glass lenses had never gained general acceptance. By 1951, a United States patent with respect to a PMMA contact lens had been issued.

Throughout the 1950's and 1960's, virtually all contact lenses manufactured and sold in the United States and throughout the world were hard (as opposed to "soft"), plastic contact lenses made of PMMA. Although PMMA lenses were a significant improvement over lenses made of glass, PMMA lenses are hard, nonpermeable by air, and do not absorb water. Therefore, such lenses can cause significant discomfort to users if worn for an extended period of time.

Through the early 1970's, PMMA hard lenses were produced by hundreds of small, independent laboratories, which served local ophthalmologists, optometrists, and opticians (the "3-0s" or "optical practitioners" or "practitioners") on a custom order basis. These laboratories generally had only a few employees and produced PMMA lenses utilizing a manual lathing process. To produce a contact lens using the manual lathing method, a manufacturer first produces or purchases a plastic lens "button," which consists of a thin, circular piece of raw plastic. The plastic lens button is

placed on a lathe machine. The machine operator manually guides a cutting device which cuts away excess material on one side of the button to form the base curve of the contact lens. The lens button is then removed from the lathe machine, turned over, and the process is repeated to form the front curve of the contact lens. The lens is then edged, polished, inspected, checked for power, and packaged for storage or shipment.

There are few variations in the manual lathing method, which is labor rather than capital intensive. The critical aspect of contact lens manufacturing using the lathing method is the quality control and attention to detail necessary to perform each and every step accurately so that the final product conforms to the specifications of the manufacturer and performs as expected by the practitioner.

B. *Development of the Soft Contact Lens and the Spin Cast Manufacturing Process*

1. Discovery and Development of the Soft Contact Lens and the Spin Cast Manufacturing Process

During the late 1940's and early 1950's, Dr. Otto Wichterle and Dr. Drahoslav Lim, Czechoslovakian chemists associated with the Czechslovakian Academy of Science (CAS), began working to formulate new hydrophilic (water absorbing) materials. By 1954, Dr. Wichterle and his associates had developed a hydrophilic gel (hydrogel) that was synthesized by copolymerization of 2-hydroxyethyl methacrylate (HEMA) with ethylene dimethacrylate, a basic liquid HEMA monomer. A monomer is a chemical compound which is capable of undergoing polymerization. Such hydrophilic material in its hardened or "polymerized" state is commonly referred to as a "polymer."

In 1955 and 1956, Dr. Wichterle and his associates incorporated the basic HEMA monomer into a contact lens for the first time. A contact lens that is manufactured using a HEMA-based material is referred to herein as a "HEMA lens," a "soft HEMA lens," or a "soft contact lens."

HEMA lenses, unlike contact lenses made of PMMA, can absorb water and as a result become soft and flexible, permitting many individuals to wear contact lenses without significant discomfort. "Soft" contact lenses are also gener-

ally more comfortable to wear due to differences in thickness, weight, and diameter.

Various clinical tests performed in Prague established that contact lenses produced from the HEMA material could be worn successfully by human patients.

The first lenses produced by Dr. Wichterle were formed by polymerizing the HEMA compound in a crude, stationary mold. In late 1961, Dr. Wichterle first manufactured soft contact lenses using a spinning open mold mounted on a crude spin cast machine which Dr. Wichterle had fabricated in the kitchen of his home. The spin cast process uses centrifugal force to produce a contact lens. The shape and power of a soft contact lens manufactured using the spin cast process is determined by the shape and size of the mold, the quantity and density of the monomer mixture injected into the mold, and the speed of the rotation of the spindle that holds the mold. Dr. Wichterle and his associates continued to produce soft contact lenses using the "spin cast method" during 1962 through 1965. They continued to improve upon the original spin cast process of producing soft contact lenses throughout this period.

In 1963, Dr. Wichterle developed a process by which the gel from which the soft HEMA contact lenses were made was transformed into a hard state, and the material was lathed, machined, ground, and polished in a fashion similar to the PMMA used to make hard contact lenses. Such material was referred to as "Xerogel."

During or prior to 1966, Dr. Wichterle and his associates prepared a three volume text entitled "Soflens Production Line Documentation." This text details the steps necessary in the manufacture of the HEMA monomer mixture used in the manufacture of a soft contact lens, as well as the procedure for manufacturing the soft contact lens itself using the spin cast process.

During the late 1970's and early 1980's, the soft HEMA lens became the predominant type of contact lens sold in the United States. Prior to 1971, the hard (PMMA) contact lens was the only contact lens available in the United States. The percentage of sales of contact lens which were soft (HEMA) contact lenses and hard (PMMA) contact lenses in the United States for the years 1978 through 1982 were

approximately as follows:

| Year | PMMA | HEMA | Other |
|------|------|------|-------|
| 1978 | 51% | 49% | - - - |
| 1979 | 39 | 54 | 6 |
| 1980 | 27 | 64 | 8 |
| 1981 | 21 | 70 | 9 |
| 1982 | 15 | 75 | 10 |

2. Relevant United States and Foreign Patents Obtained by Dr. Wichterle and Associates

a. Materials Patents

On March 28, 1961, the U.S. Patent Office (Patent Office), issued to Dr. Wichterle and Dr. Lim, a patent with respect to a "process for producing shaped articles from three-dimensional hydrophilic high polymers" (Material Patent I). The 17-year term of Material Patent I expired on March 28, 1978.

On November 30, 1965, the Patent Office, issued to Dr. Wichterle and Dr. Lim a patent with respect to "cross-linked hydrophilic polymers and articles made therefrom (Material Patent II). The 17-year term of Material Patent II expired on November 30, 1982. On June 20, 1972, the Patent Office issued to Dr. Wichterle and Dr. Lim a reissued patent which was a reissue of Material Patent II.

b. Spin Cast Patents

On October 29, 1968, the Patent Office issued to Dr. Wichterle and CAS a patent with respect to a "method for centrifugal casting a contact lens" (Spin Cast Patent I). The 17-year term of Spin Cast Patent I expired on October 29, 1985.

On May 2, 1972, the Patent Office issued to Dr. Wichterle and CAS a patent with respect to a "method of centrifugally casting thin edged corneal contact lenses" essentially consisting of soft hydrogels of organic polymers (Spin Cast Patent II). Dr. Wichterle and CAS disclaimed the portion of the 17-year term of Spin Cast Patent II which extended beyond October 29, 1985.

On February 17, 1970, the Patent Office issued to Dr. Wichterle and CAS a patent with respect to a "method of manufacturing soft and flexible contact lenses" (Xerogel Spin Cast Patent). Dr. Wichterle and CAS disclaimed the

portion of the 17-year term of Xerogel Spin Cast Patent which extended beyond January 2, 1985.

c. Other Process Patents

On January 2, 1968, the Patent Office issued to Dr. Wichterle and CAS a patent with respect to "reshaping a xerogel by mechanical removal and swelling to form a hydrogel contact lens" (lathing patent). The term of the lathing patent expired on January 2, 1985.

On July 2, 1974, the Patent Office issued to Dr. Wichterle and CAS a patent with respect to a "contact lens blank or replica made from anhydrous, sparingly cross-linked hydrophilic copolymers" (replica patent). The term of the Replica Patent will expire on July 2, 1989.

Material Patent I and Material Patent II are referred to collectively herein as the "material patents." The material patents, Spin Cast Patent I, and Spin Cast Patent II, the Xerogel Spin Cast Patent, the lathing Patent, and the replica Patent, and all United States and foreign patents related thereto as the context requires, are referred to collectively herein as the "Wichterle Patents."

In addition, Dr. Wichterle and CAS filed patent applications and obtained patents in numerous foreign countries with respect to the technology and inventions covered by the Wichterle patents. However, neither Dr. Wichterle nor CAS obtained any patents in the Republic of Ireland with respect to the soft contact lens, the spin cast process, or any other technology embodied in the Wichterle patents. Nor did any representative or agent of CAS or Dr. Wichterle obtain or attempt to obtain at any time approval from the FDA to market a soft HEMA lens in the United States.

C. *License Agreements Between Czechoslovak Academy of Science and National Patent Development Corp. and Related Entities*

During and prior to the years at issue, National Patent Development Corp. (NPDC) was a publicly owned firm that was unrelated to B&L or its subsidiaries.

On or about March 12, 1965, CAS, represented by Polytechna, a Czechoslovakian firm, and Flexible Contact Lens Corp., represented by National Patent Development Corp., entered into a license agreement pursuant to which

CAS granted to Flexible an exclusive license (CAS License Agreement) to manufacture and sell the soft HEMA contact lens developed by Dr. Wichterle (Wichterle lens) in the Western Hemisphere.[2] CAS also agreed to provide Flexible with 25,000 first class quality sample Wichterle lenses. The license agreement was for an initial term of no less than 10 years with annual renewals at the option of the parties thereafter. Pursuant to this agreement, Flexible was obligated to pay to CAS an initial fee of $75,000 and a royalty of $2.50 per lens sold during the 1st year of the agreement. During the 2nd through 6th years of the agreement, Flexible agreed to pay CAS a royalty of $2 per lens for the first 100,000 lenses sold each year; a royalty of $1.50 per lens for the next 150,000 lenses sold; and a royalty of $1 per lens for every lens in excess of 250,000 sold each year. After the 6th year of the agreement, the royalty would be $1 per lens sold. The agreement also provided that the royalty payable in the 2nd through 6th years of the agreement be no less than $100,000 per year. On or about May 6, 1965, the parties adopted two amendments to this agreement one of which extended the territory covered by the agreement to include South Africa in exchange for an addition of $5,000 to the initial $75,000 fee described above. The exclusive license granted by CAS to Flexible pursuant to the CAS License Agreement covered the Wichterle Patents, all related patents subsequently issued in the United States or other countries in North America, South America, and Central America, and any other know-how, formulas, or technical information which related to the technology or inventions covered by the Wichterle Patents and all related patents.[3] A sublicense of the CAS License Agreement was subsequently granted to NPDC by Flexible.

[2]During the 1960's, 1970's, and early 1980's, the following corporations were either wholly or partially owned subsidiaries of National Patent Development Corp.; Hydron Europe, Inc. (Hydron Europe), Hydron International, Ltd. (Hydron International), Hydron Pacific, Ltd. (Hydron Pacific), Flexible Contact Lens Corp. (Flexible), Flexible Contact Lens (Nevada), Inc. (Flexible-Nevada), Hydron Australia, Ltd. (Hydron Australia), and NPD Optics, Inc. (NPD Optics). NPD Optics had a division known as American Hydron. Hereinafter NPDC together with its subsidiaries as the context requires are referred to as NPDC.

[3]On or about Dec. 18, 1965, NPDC and KOVO, a Czechoslovakian corporation, entered into an agreement pursuant to which NPDC agreed to purchase from KOVO two production spin cast machines based on the technology set forth in certain of the Wichterle patents for $150,000.

On or about May 25, 1966, NPDC and CAS, represented by Polytechna, entered into a license agreement pursuant to which CAS granted to NPDC a 15-year exclusive license to manufacture and sell the Wichterle lens in Israel. In consideration for the exclusive license, NPDC agreed to pay CAS an initial fee of $1,750 and a royalty of $2 for each Wichterle lens sold by NPDC in Israel.

On or about May 20, 1968, the parties to the CAS License Agreement adopted an amendment to the agreement to modify the royalty provisions contained therein (1968 Amendment). Pursuant to the 1968 Amendment, in 1969 NPDC was required to pay royalties to CAS in the amount of 6 percent of the net selling price of each soft contact lens sold in the United States and Canada with a reduction in the rate to 5 percent of the net selling price after the minimum royalty was reached (not to be less than $1 per lens).[4] Additionally, NPDC was required to pay CAS a royalty in the amount of 5 percent of the net selling price of each soft contact lens sold in countries under the agreement other than the United States and Canada. "Net selling price" was defined as the net proceeds per Wichterle lens sold to the first independent buyer that was not a subsidiary or affiliate of NPDC the licensor. Unless otherwise indicated, this definition of net selling price or "net sales" applies to all subsequently discussed licensing agreements.

On June 26, 1967, CAS and NPDC entered into a license agreement pursuant to which CAS granted to NPDC an exclusive license to manufacture and sell the Wichterle lens in six specified countries in the Far East (Far East License Agreement). Pursuant to such agreement, NPDC was required to pay to CAS an initial fee of $35,000 and royalties in the amount of 5 percent of net sales in the specified territories. A sublicense was subsequently granted to Hydron International by NPDC.

On or about October 16, 1970, CAS and Hydron Europe entered into an agreement pursuant to which CAS granted to Hydron Europe an exclusive license for a minimum term of 15 years to manufacture, use, and sell the Wichterle soft contact lens throughout Europe (European License Agree-

---

[4]The amendment also increased the minimum royalty payable during the 5th and 6th years of the agreement from $100,000 to $200,000 per year.

ment). Pursuant to such agreement, Hydron Europe was required to pay to CAS an initial fee of $25,000 and royalties in the amount of 5 percent of net sales in the specified territories. The agreement also contained provision for minimum royalties of between $25,000 and $50,000 per year.

On February 15, 1972, Hydron Europe, Optics Bermuda, Ltd., NPDC, and Smith & Nephew Associated Cos. Ltd., entered into a license agreement pursuant to which Hydron Europe granted to Optics an exclusive license to manufacture, use, and sell the Wichterle lens in the United Kingdom and in certain specified European countries. After a period of 2½ years the license became nonexclusive. Pursuant to such agreement, Optics was required to pay to CAS on behalf of Hydron Europe royalties in the amount of 5 percent of net sales in the specified territories.

### D. *Sublicense Agreements Between NPDC and B&L and Certain Related Litigation*

#### 1. Sublicense Agreements Between NPDC and B&L

On or about October 6, 1966, NPDC and B&L entered into an agreement pursuant to which NPDC granted to B&L, inter alia, an exclusive sublicense to manufacture, use, sell, and distribute the Wichterle lens in the Western Hemisphere and to use the Wichterle patents and any related patents then or subsequently issued to CAS in such territories and all of the related technical know-how which CAS licensed to Flexible, and which Flexible licensed to NPDC (NPDC Sublicense Agreement). NPDC also agreed to endeavor to acquire monomer mixture for B&L under certain terms and conditions. On or about August 16, 1971, the parties to the NPDC Sublicense Agreement and Flexible adopted an amendment to the NPDC sublicense agreement, which, inter alia, extended the exclusive sublicense to include Israel and South Africa.

Pursuant to the NPDC Sublicense Agreement, B&L agreed to pay to NPDC a royalty with respect to domestic sales in an amount equal to 50 percent of the difference between (a) B&L's sales of soft contact lenses in the United States and (b) the sum of (i) 35 percent of such sales, (ii) all direct and indirect expenditures incurred by B&L in connection with

the development, engineering, and manufacture of the soft contact lens, the spin cast machine, and related products, (iii) all other direct costs and expenses incurred by B&L in connection with soft contact lenses sold in the United States, (iv) all amounts paid to CAS, and (v) all previously unrecouped amounts referred to above. With respect to foreign sales, B&L agreed to pay to NPDC a royalty in an amount equal to (i) 10 percent of its sales to purchasers outside the United States plus (ii) $1 per each lens sold to purchasers outside the United States. B&L also agreed to purchase from NPDC the two automatic spin cast lens manufacturing machines which NPDC had agreed to purchase from KOVO on the same terms that NPDC had agreed to.

On August 16, 1971, NPDC, Hydron Pacific, and B&L entered into a sublicense agreement pursuant to which Hydron and NPDC granted to B&L, inter alia, an exclusive sublicense to make, use, sell, and distribute the Wichterle lens in Japan, Okinawa, South Korea, the Philippines, Taiwan, and Hong Kong (Pacific Sublicense Agreement). The Pacific Sublicense Agreement covered any patents issued in such countries which related to the technology or inventions covered by the Wichterle patents.

## 2. Litigation with Respect to the Wichterle Patents in Europe

In May 1969, B&L and NPDC agreed that NPDC would assist B&L in obtaining a license from CAS to manufacture and sell soft contact lenses in various European countries. Notwithstanding this agreement, NPDC obtained a license with respect to Europe before B&L could negotiate such a license with CAS. Thereafter, in 1972, B&L began selling soft contact lenses in Europe without a license under the Wichterle patents in Europe.

On November 8, 1972, NPDC and Hydron Europe filed a patent infringement action against B&L and Bausch & Lomb Optical Co. Ltd., a subsidiary of B&L, in the High Court of Justice, Chancery Division, London, England, seeking to enjoin B&L from selling soft contact lenses covered by the Wichterle patents. On December 26, 1972, CAS, along with NPDC and Hydron Europe, commenced a

similar patent infringement action against B&L France S.A. in a French court.

On December 4, 1972, B&L filed an action against NPDC and Hydron Europe in New York State Supreme Court alleging that NPDC and Hydron Europe were constructive trustees holding, for the benefit of B&L, a license from CAS with respect to the Wichterle patents in Europe, and seeking all profits derived by such parties in Europe.

On February 14, 1973, NPDC, Hydron Europe, and B&L entered into an agreement pursuant to which they agreed to discontinue the above described actions. Pursuant to this settlement agreement, Optics, Hydron Europe, Hydron-Lens B.V., and Contact Lens Insurance Ltd., granted to B&L a nonexclusive, nonassignable, and nontransferable sublicense for the manufacture, use, and sale of the Wichterle lens in the United Kingdom and 18 specified European countries in exchange for royalties in the amount of 6 percent of net sales in England and France and 5 percent of net sales in the other specified territories (European Sublicense Agreement). The European Sublicense Agreement covered all patents issued in Europe which related to the technology or inventions covered by the Wichterle patents.

Also on February 14, 1973, NPDC, Hydron Pacific, and Hydron Australia, granted to B&L a nonexclusive sublicense to manufacture, use, and sell the Wichterle lens in Australia, New Zealand, and Singapore in exchange for royalties in the amount of 5 percent of net sales in the specified territories (Australian Sublicense Agreement). The Australian Sublicense Agreement covered all patents issued in Australia, New Zealand, and Singapore which related to the technology or inventions covered by the Wichterle patents.

3. Litigation Relating to Soft Contact Lens Technology

From 1967 through 1972, B&L paid no amounts to NPDC pursuant to the NPDC Sublicense Agreement in excess of the amounts due to CAS because the revenues received by B&L in such years with respect to sales of soft contact lenses, in the aggregate, did not exceed the costs and expenses incurred by B&L, as computed by B&L, with

respect to soft contact lenses in such years, in the aggregate.

On October 30, 1972, NPDC filed a suit in the Supreme Court of the State of New York against B&L (accounting action). NPDC alleged inter alia, that B&L had violated the terms of the NPDC Sublicense Agreement and requested an accounting under the terms of such agreement. NPDC alleged that B&L owed it at least $3 million pursuant to the NPDC Sublicense Agreement.[5]

On April 19, 1974, B&L filed a suit against Hydron Pacific, NPDC, and Hydron Europe, in the Supreme Court of the State of New York, in which B&L alleged, inter alia, that Hydron Pacific and NPDC breached the Pacific Sublicense Agreement and that Hydron Europe interfered with the performance of such agreement.

On August 23, 1974, CAS, NPDC, Flexible, and B&L filed a suit against Automated Optics, Inc. in the U.S. District Court for the District of Colorado in which the plaintiffs alleged that Automated Optics was infringing upon certain patents held by CAS (Automated Optics litigation), including the materials patents and the lathing patent. Such litigation did not involve the spin cast process.

On September 25, 1975, Hydron Pacific filed a suit against B&L in the Supreme Court of the State of New York, in which Hydron Pacific alleged, inter alia, that B&L did not have an exclusive license under certain Japanese patents held by CAS in Japan.

In December 1975, Milton Roy Co. and Milroy-Automated, Inc. filed a declaratory judgment action against B&L, NPDC, Flexible, Flexible Contact Lens (Nevada), Inc., and CAS in the U.S. District Court for the District of Delaware in which the plaintiffs sought a declaratory judgment that plaintiffs were not infringing upon certain patents held by CAS (Milton Roy litigation), including the materials patents and the lathing patent.

---

[5]On Nov. 6, 1973, NPDC filed an amended complaint in the Accounting Action raising additional allegations and requesting the payment of royalties under the NPDC Sublicense Agreement. Such first amended complaint asserted a claim for damages in the amount of $10 million.

A second amended complaint filed in the Accounting Action raised additional allegations and asserted a claim for damages in the amount of $23 million.

On January 16, 1976, NPDC et al. filed an action against B&L and Mr. Daniel Schuman, chief executive officer of B&L, in the U.S. District Court for the Southern District of New York, in which NPDC sought antitrust damages and patent infringement damages against B&L. Each of the defendants in such action denied the allegations raised by NPDC.

In January and February 1976, B&L filed cross-claims against NPDC, Flexible, and CAS in the Automated Optics litigation and the Milton Roy litigation, claiming that certain patents held by CAS, including the materials patents, the spin cast patents, the lathing patent, and the replica patent were not valid patents and were obtained by fraud. B&L also amended its answer in the accounting action to claim as a defense that the subject patents were invalid and unenforceable.

4. Settlement of Litigation Between NPDC and B&L and the 1977 Sublicenses

On January 7, 1977, NPDC, Flexible-Nevada, and B&L entered into a settlement agreement pursuant to which the parties settled the litigation among them (Settlement Agreement). Flexible-Nevada was a successor in interest to Flexible.

Pursuant to the Settlement Agreement, B&L paid to NPDC $11,500,000 in settlement of the litigation between B&L and NPDC. B&L paid another $2 million in exchange for a new sublicense agreement pursuant to which Flexible-Nevada granted to B&L a fully paid, nonexclusive sublicense (1977 Flexible License Agreement), under all of the Wichterle patents in the Western Hemisphere, the Republic of South Africa and Israel, to manufacture, use, and sell soft contact lenses, to practice all processes relative to such lenses, and to make and have made the material from which such lenses are made. B&L paid an additional $500,000 to NPDC in exchange for a new sublicense agreement pursuant to which NPDC granted to B&L and its subsidiaries a fully paid, nonexclusive sublicense (1977 NPDC License Agreement) under all of the Wichterle patents in other countries of the world, including the territories previously covered by the Pacific Sublicense Agreement, the Australian Sublicense

Agreement, and the European Sublicense Agreement. The NPDC Sublicense Agreement, the Pacific Sublicense Agreement, the European Sublicense Agreement, and the Australian Sublicense Agreement were canceled by the parties thereto and the five pending actions between the parties to the Settlement Agreement were dismissed, and releases pertaining thereto were granted. The 1977 NPDC License Agreement and the 1977 Flexible License Agreement are referred to collectively herein as the "1977 NPDC Sublicenses." B&L relinquished the exclusive right to manufacture and sell soft contact lenses in the United States under the Wichterle patents, and NPDC thereafter was free to manufacture and sell soft contact lenses in the United States under such patents and was free to enter into license agreements with other companies with respect to the manufacture and sale in the United States of the soft contact lens.[6]

E. *B&L's Operations and Activities With Respect to Soft Contact Lenses and Spin Cast Technology from 1966 Through 1971*

  1. B&L's Development of the Soft Contact Lens and Spin Cast Process

B&L acquired the first of the two Wichterle spin cast machines it had agreed to acquire from NPDC in late 1966. Four Czechoslovakian technicians and various other professionals traveled to Rochester to assist B&L employees in the installation and operation of this machine. Dr. Wichterle himself visited Rochester in January 1968, to discuss various aspects of soft contact lenses and the spin cast

---

[6] In light of the settlement of its litigation with B&L, NPDC considered it desirable to adjust its contractual relationship with CAS. Therefore, on or about Jan. 1, 1977, NPDC, Flexible-Nevada, and CAS, represented by Polytechna, entered into an agreement pursuant to which the parties terminated and canceled the CAS License Agreement, the Far East License Agreement, and the European License Agreement in exchange for a total payment of $3,500,000 from Flexible-Nevada to CAS.

Also on or about Jan. 1, 1977, CAS, represented by Polytechna, and Flexible-Nevada entered into an Assignment Agreement pursuant to which CAS assigned to Flexible all of its rights with respect to the Wichterle patents in exchange for a payment of $500,000 (CAS Assignment Agreement).

The Automated Optics Litigation was settled in 1977. Pursuant to the settlement of that litigation, Automated Optics paid NPDC and its affiliates a royalty of 5 percent of sales for a license to maintain, use, and sell soft contact lenses under the Wichterle Materials, Lathing, and Replica Patents.

technology. In addition to the spin cast machine itself, B&L received from Dr. Wichterle and CAS copies of the three Wichterle Soflens Production Line Documentation Manuals which included technical information, drawings, and tables relating to soft contact lenses and the Wichterle spin cast machine. B&L also received from NPDC a book entitled "Documentation of Hydrophilic Contact Lenses" in January 1967. This book, which was prepared by Drs. Wichterle and Lim, contained various technical information concerning soft contact lenses.

In April 1967, four employees of B&L travelled to Prague, Czechoslovakia, to obtain additional information with respect to the soft contact lens project.

The second spin cast machine B&L had agreed to acquire was purchased in 1967 and moved to Rochester early in 1968. B&L retained the right to reject both spin cast machines if they were unable to attain an actual yield of good lenses of at least 20 percent of the lenses produced. Although B&L was unable to obtain these yields initially, the machines were kept and from 1966 until 1972, B&L employees under the direction of William Coombs worked to refine the spin cast technology and increase yields to an acceptable level. By 1971, approximately 24 B&L employees were involved in the soft contact lens project either full or part-time. By the early 1970's, B&L had adapted the machines to use ultraviolet (UV) light rather than heat to polymerize the monomer mixture. At some point in the late 1960's, B&L began using plastic (polyvinylchloride or PVC) molds rather than glass molds. Dr. Wichterle had contemplated that polymerization with UV light and plastic molds could be used in the spin cast process although neither was incorporated by him in the design of the spin cast machine. B&L conducted other development activities during the years 1967 through 1971 with respect to the spin cast machines including:

(i) Engineering the spindles which held the various molds and associated drive equipment such that the molds in the spindles would spin true;

(ii) Engineering the spindles and drive equipment to allow constant and accurate speed control;

(iii) Engineering a system to control precisely the injection of liquid monomer mixture into the spinning mold; and

(iv) Reducing the time from injection of liquid monomer until the partial curing of the monomer mixture.

By 1971, B&L was able to obtain yields of about 50 percent on the spin cast machines. By 1981, yields were averaging 70-80 percent and in some cases as high as 90 percent of lenses produced.

During the years 1967 through 1971, as in all subsequent years through 1982, B&L produced the liquid monomer mixture used in the manufacture of soft contact lenses by a purification and mixing process. B&L used basically the same monomer mixture originally employed by Dr. Wichterle. The only change in the monomer mixture itself was a change in the catalyst required to cause polymerization which was necessitated by the change in the polymerization method from heat to UV light.

From 1966 through and including 1970, B&L incurred total costs with respect to its soft contact lens project of approximately $3,609,071, which are summarized as follows:

| | |
|---|---:|
| Research and process development | $1,435,282 |
| Manufacturing costs | 380,361 |
| Other direct charges | 444,842 |
| Consulting and professional services | 104,996 |
| Royalties | 400,000 |
| Interest | 509,892 |
| Equipment | 333,698 |
| | 3,609,071 |

## 2. FDA Activities

In 1967, B&L voluntarily contacted the FDA to discuss B&L's plans to market a soft contact lens in the United States. The FDA advised B&L that the soft contact lens would be treated as a "medical device" rather than as a new "drug" and therefore would not require FDA approval prior to use and sale in the United States. However, on December 12, 1968, the FDA advised B&L that soft contact lenses were being considered a "new drug" by the FDA rather than a "device," and that FDA approval was therefore required prior to the marketing of such product in the United States. The FDA regulations required that an investigatory new drug application (IND) be filed prior to the performance of any clinical studies on humans to evaluate

the product's quality and safety. B&L had already begun performance of clinical studies in 1967 and was permitted to continue ongoing clinical studies pending the filing of an IND. Prior to December 12, 1968, no contact lenses had ever been subjected to the IND and new drug application (NDA) approval process.

On April 8, 1969, B&L filed with the FDA an IND with respect to the soft contact lens. On September 26, 1969, B&L filed with the FDA an NDA with respect to the soft contact lens. Such NDA included, inter alia, a report and exhibits including, among other items, clinical investigation reports, new drug experience reports, an index to articles relative to soft contact lenses, and manufacturing procedures.

In February 1970, B&L withdrew its NDA and filed a new NDA in July 1970. During 1970 and early 1971, B&L sent several reports to the FDA relative to clinical studies concerning soft contact lenses. On March 18, 1971, the FDA approved B&L's NDA with respect to soft contact lenses, and B&L thereafter was permitted to market soft contact lenses in the United States. The FDA approval of an NDA with respect to B&L's soft contact lens, the first soft contact lens for which approval was requested from the FDA, took approximately 1 year and 11 months from the date of the original FDA filing.

Beginning with the FDA's approval, B&L maintained a master file at its offices in Rochester. Through 1982, such master file consisted of approximately 100 volumes pertaining to applications, reports, letters, correspondence, and other documents relative to the FDA regulatory requirements with respect to soft contact lenses, saline solutions, sterilizers, export approvals, marketing packages, carrying cases, advertisements, manufacturing, and other matters.

F. *Development of the Soft Contact Lens Market in the United States From 1971 through 1982*

In May 1971, B&L first marketed soft contact lenses in the United States by introducing the product in a series of regional seminars across the country. By the end of 1971, soft contact lenses were generally available throughout the United States.

Beginning in 1973, other companies obtained FDA approval with respect to soft contact lenses and entered the United States soft contact lens market. Some companies developed new materials which were different from the Wichterle soft contact lens material licensed to B&L, while other companies used materials which were potentially subject to infringement actions under the Wichterle materials patents.

Competition in the soft contact lens market in the United States increased significantly from 1977 through 1982 as the market for soft contact lenses grew rapidly. Set forth below is a schedule which lists the percentage market share of each of the major competitors in the United States market for soft contact lenses from 1978 through 1982.

| Firm | 1978 | 1979 | 1980 | 1981 | 1982 |
|------|------|------|------|------|------|
| Bausch & Lomb | 50.6% | 47.9% | 52.8% | 48.3% | 41.5% |
| Hydrocurve (Revlon, Barnes Hind) | 12.2 | 14.3 | 11.2 | 9.8 | 13.0 |
| American Hydron | | 2.5 | 4.7 | 6.9 | 8.5 |
| American Optical | 15.7 | 18.5 | 13.1 | 10.7 | 7.0 |
| Ciba Vision | | | | 0.1 | 1.7 |
| UCO Optics | 5.3 | 7.7 | 6.5 | 7.9 | 6.6 |
| Cooper Vision | | 0.4 | 1.8 | 3.4 | 6.4 |
| Wesley-Jessen | 6.0 | 3.8 | 3.1 | 2.5 | 4.6 |
| Lombart | | 2.5 | 3.6 | 4.1 | 2.8 |
| Vistakon | 1.1 | 1.1 | 0.5 | 1.4 | 1.3 |
| Syntex | | | | 0.8 | 2.2 |
| Other | 8.9 | 1.1 | 2.7 | 3.8 | 4.3 |

## G. Development of New Soft Contact Lens Products

### 1. Thin Soft Contact Lenses

By the late 1970's and early 1980's, most competitors in the United States soft contact lens industry had a "thin" soft contact lens on the market. Thin soft contact lenses are more comfortable than the "thicker" soft contact lenses available in the mid-1970's. These lenses were produced by B&L using the same basic spin cast technology as used to produce standard soft contact lenses. However, this lens required the development and use of new molds and new spin parameters such as spin speed, amount of monomer,

and time to polymerize. B&L introduced its thin soft lens in late 1977.

### 2. Toric Soft Contact Lenses

In 1978, Hydrocurve became the first company in the soft contact lens industry to market a "toric" soft contact lens in the United States. Toric lenses are designed to correct astigmatism, that is, an irregularly shaped cornea. B&L was unable to develop a marketable toric soft contact lens through 1979. Therefore, B&L acquired the assets of Milton Roy Co. (Milton Roy) in 1979 in order to gain access to that company's toric lens production technologies. After the acquisition and through December 31, 1982, B&L continued to use Milton Roy's Sarasota facility for manufacture of toric soft contact lenses using a lathing method.

### 3. Extended Wear Soft Contact Lenses

Extended wear soft contact lenses are soft contact lenses which can be worn for periods of several days or more. At least two competitors in the United States soft contact lens market introduced extended wear soft contact lenses for cosmetic use in the United States market early in 1981. B&L's research and development program had not developed an extended wear soft contact lens which was marketable as of the end of 1982. B&L, therefore, entered into a licensing agreement with American Hospital Supply Corp., which had developed an extended wear soft contact lens that was marketed in the United States for aphakic and therapeutic purposes. B&L sold such lenses under the name "CW-79."

### 4. Rigid Gas Permeable Contact Lenses

In 1978, Danker Laboratories became the first company to develop a marketable "rigid gas permeable" contact lens for the United States market. Rigid gas permeable lenses are hard lenses which are produced from a material which permits oxygen to pass through the lens to the eye. Several other competitors of B&L introduced gas permeable lenses soon after the first introduction of such lenses in 1978. B&L began research and development activities with respect to a rigid gas permeable contact lens in the 1970's. However, B&L's efforts to develop a rigid gas permeable lens were

unsuccessful. Subsequent to 1982, B&L acquired the assets of a company which had developed a gas permeable contact lens.

## H. *Development of Manufacturing Technologies*

### 1. The Spin Cast Process

From 1967 through the first half of 1971, B&L manufactured soft contact lenses in Rochester using the two Wichterle spin cast machines acquired from NPDC via KOVO. In late 1971, B&L fabricated an additional spin cast machine based on the two Wichterle spin cast machines and the spin cast technology licensed from NPDC. This new machine was also used in Rochester in the production of soft contact lenses and incorporated the modifications made to the technology by B&L in the late 1960's. At some point in the early 1970's, B&L made the decision to commit to the spin cast technology. It thus discontinued operations at its Canadian facility, which had been manufacturing soft contact lenses using a lathing process since the 1970's, prior to 1981.

By 1981, B&L was able to produce soft contact lenses for a cost of $1.50 per unit with a standard cost of $1.54 per unit. Standard cost is a cost accounting concept and is an estimate of the cost at which a unit can be produced under normal circumstances.

### 2. Semiautomatic and Automatic Lathing Process

Virtually all of B&L's competitors in the United States soft contact lens market through 1977 used the manual lathing method to manufacture soft contact lenses. During the period 1977 through 1980, various manufacturers sought to automate various functions performed manually as part of the lathing process. Elimination of manual functions both reduced the per-unit costs of producing soft contact lenses using the lathing method, and improved the accuracy with which a lens of a designated specification could be reproduced. Petitioners' contact lens industry expert, Dr. Irving J. Arons, estimated that lenses can be produced using the lathing method for a unit cost varying between $3.50 and $10 per lens. During 1981 and 1982,

NPDC was able to produce lathed lenses for $6.18 and $6.46 per unit, respectively.

### 3. The Cast Molding Process

In the mid-1970's, the original cast molding process was developed by Thomas Sheperd, an employee of International Lens Corp. (ILC). In the cast molding process, soft contact lenses are formed by polymerizing a monomer mixture in the cavity between two stationery molds. Mr. Sheperd obtained various patents in the United States with respect to the cast molding process which he assigned to ILC. American Optical also developed a cast molding process for which it obtained certain patents in the late 1970's.

On February 18, 1977, ILC and NPDC entered into an agreement pursuant to which ILC granted to NPDC a license to make, use, and sell soft contact lenses using ILC's patents, trade secrets, technical information, formulas, manufacturing know-how, research and development information, and similar information pertaining to the ILC cast molding process (1977 ILC Agreement). The license was exclusive in North America, Japan, Okinawa, Australia, New Zealand, and the U.S.S.R., and nonexclusive throughout the remaining countries of the world. In exchange for this license, NPDC agreed to pay ILC royalties equal to the lesser of 5 percent of net sales or 50 cents per lens. In 1979, an amendment to the agreement reduced the royalty to the lesser of 4 percent of net sales or 50 cents per lens.

On December 6, 1979, NPDC and CooperVision entered into an agreement pursuant to which NPDC granted a coexclusive license to CooperVision (1979 CooperVision Agreement) to manufacture extended wear soft contact lenses using the ILC cast molding process in the various countries in which NPDC had exclusive rights to the cast molding process pursuant to the 1977 ILC agreement. The license included all information to which NPDC was entitled pursuant to the 1977 ILC agreement, as well as any additional information pertaining to the cast molding process which was developed by NPDC. In exchange for the license, CooperVision agreed to pay NPDC a royalty of $1 per extended wear lens manufactured using the ILC cast molding process, with a 50-percent reduction in the royalty

if patent protection was lost. In addition, CooperVision agreed to pay NPDC an initial license fee of $2 million, $1 million of which was payable immediately, and $1 million of which was payable at the rate of $4 per lens sold for the first 250,000 lenses sold by CooperVision. The agreement was amended on March 20, 1981, to include daily wear soft contact lenses produced using the ILC cast molding process. Pursuant to this amendment, CooperVision agreed to pay to NPDC for each daily wear soft contact lens manufactured and sold using the ILC cast molding process a royalty of 25 cents above the royalty per lens paid by NPDC to ILC, not to exceed a total of 75 cents per lens. In addition, CooperVision agreed to pay NPDC an additional lump sum license fee of $700,000. A second amendment agreed to on April 10, 1981, altered the royalty provision of the initial agreement with respect to extended wear soft contact lenses to bring it into conformity with the royalty provisions for daily wear lenses which were adopted in the March 20, 1981, amendment. NPDC was in a difficult financial position in 1979 at the time the 1979 CooperVision Agreement was being negotiated. Thus the up-front payments due NPDC under the agreement were particularly attractive to it.

On August 5, 1981, CooperVision agreed to make a one-time, lum-sum payment of $500,000 for access to NPDC's FDA masterfile with respect to standard daily wear soft contact lenses and for NPDC's agreement not to file suit against CooperVision under the Wichterle materials patents and Wichterle replica patent with respect to the sales of soft contact lenses in the United States and other countries.[7]

By the early 1980's, several companies were using a cast molding process to manufacture soft contact lenses in the United States including NPDC, CooperVision, and American Optical. NPDC and its affiliates obtained FDA approval to market soft contact lenses manufactured using the cast molding process in 1980. In 1981 and 1982, NPDC and its

---

[7]On or about Nov. 2, 1981, CooperVision acquired ILC and thus became the owner of the ILC cast molding patents and all ILC's other technology and know-how related to the cast molding process. As a result, NPDC and CooperVision entered into an agreement on Jan. 6, 1982, pursuant to which the 1979 CooperVision Agreement was generally terminated. Thereafter, NPDC became a licensee of CooperVision with respect to the ILC cast molding process and patents.

affiliates manufactured approximately 394,882 and 509,612 soft contact lenses, respectively, using the cast molding process. NPDC's per unit manufacturing costs for lenses produced using the cast molding process were $4.19 and $4.02 in 1981 and 1982, respectively. NPDC's standard cost of manufacturing soft contact lenses using the cast molding process was $3.33 in 1981.

4. The Vertical Spin Cast Process

By the late 1970's, Dr. Wichterle had developed a new spin cast machine which embodied all of the concepts of the initial spin cast design, except that the molds containing the liquid monomer mixture were spun while stacked in a tube rather than spun individually on spindles situated on a rotating table. This advance on the initial spin cast design is hereinafter referred to as the "vertical spin cast process."

On July 6, 1981, CAS, represented by Polytechna, and NPDC entered into an agreement pursuant to which CAS granted to NPDC an exclusive license to make, use, and sell soft contact lenses using the Wichterle vertical spin cast method in the Western Hemisphere, Western Europe, and certain Pacific Rim countries. The license included all patented and unpatented technical, engineering, and manufacturing information relating to the vertical spin cast method as well as any additional information subsequently developed by CAS. The agreement also contemplated the purchase of at least one Wichterle vertical spin cast machine by NPDC from CAS, and that CAS would make technicians available to NPDC on a fee basis to provide start up assistance in connection with NPDC's commencement of contact lens production using the vertical spin cast method. In exchange for the license, NPDC agreed to pay to CAS royalties equal to 5 percent of the net selling price of all soft contact lenses manufactured using the Wichterle vertical spin cast process. The agreement also provided for an escalating minimum royalty payment and a reduction in the royalty rate to 2½ percent should CAS begin using the process itself in any one of the licensed territories.

NPDC considered the vertical spin cast process to be a "quantum jump" in the state of the art of spin cast technology. Between 1981 and September 1984, NPDC spent

approximately $300,000 for purchase and modification of vertical spin cast machines. During this period, NPDC personnel worked to master the process, and conducted clinical tests on lenses produced using the vertical spin cast method. FDA approval for the sale in the United States of soft contact lenses produced using the vertical spin cast process was obtained in September 1984.

Through 1982, B&L's competitors in the United States used the manual lathing process, the cast molding process, or various automated and semiautomated lathing processes to produce soft contact lenses. Through 1982, no firm other than B&L manufactured soft contact lenses in the United States using the spin cast process. B&L's effective monopoly over use of the spin cast method allowed it to produce soft contact lenses for a cost significantly below that attainable by any of its competitors during this period. No company used the vertical spin cast process to produce soft contact lenses for sale prior to 1984.

Contact lenses within the same diopter or power range are generally considered fungible. Thus the consumer is generally indifferent as to whether a lens is manufactured using the spin cast, lathing, or some other process. However, soft contact lenses manufactured using the spin cast process do enjoy an advantage as to reproductibility. Thus it is more likely to get an exact reproduction of a lost or damaged lens through use of the spin cast process than with some other manufacturing process.

I. *Research and Development Activities of B&L's Soflens Division*

Prior to 1982, the B&L Soflens Division research and development function investigated the performance of various soft contact lens designs on the eyes of human subjects. The function also investigated new contact lens materials and performed assessments of potential soft contact lenses and associated products. In 1978, 1979, and 1980, the major research and development projects in the Soflens Division were "Project W," "hard gas permeable lenses," "toric soft contact lenses," "accessories research," and "solutions research." Project W was a project to develop an extended wear lens using a new lens material. As stated previously,

this development effort proved unsuccessful and B&L licensed the extended wear technology of American Hospital Supply Corp. in 1983.

On September 3, 1974, the Patent Office issued to Richard J. Wrue, an employee of B&L, a patent with respect to an "Apparatus for and method of edging a nonrigid lens," and on July 29, 1975, the Patent Office issued to Mr. Wrue a patent with respect to a "method of edging a nonrigid lens." The patents were assigned to B&L when granted. The technology to which those patents relate was used by B&L and B&L Ireland in the commercial manufacture of soft contact lenses in the years 1981 and 1982. B&L and B&L Ireland consider such technology to be part of the technology covered by the license agreement between B&L Ireland and B&L, dated January 1, 1981.

## J. *Sales and Marketing Activities of B&L's Soflens Division*

In the mid-1970's, B&L had field marketing sales personnel who contacted practitioners and chain store representatives in the United States to market soft contact lenses and related products. At the end of 1982, B&L had approximately 185 field sales employees.

Additionally, B&L had approximately 120 employees engaged in marketing sales support who were employed within the United States.

In 1981 and 1982, among the duties of the Soflens Division marketing personnel were the preparation and organization of sales programs, brochures, advertising copy, and exhibits at trade shows; sales forecasting and interface with research and development personnel relative to new products. Marketing personnel of certain of B&L's competitors performed similar functions on behalf of their respective employers.

B&L had a system for the receipt and resolution of complaints concerning soft contact lens products and related products from 1978 through 1982. The employees engaged in this activity were employed in Rochester.

B&L associated the Bausch & Lomb trademark with its soft contact lens products in the United States. B&L also associated the Soflens trademark with such products in the United States.

B&L and its subsidiaries claimed common law or other unregistered copyrights with respect to promotional materials relative to soft contact lenses and related products. However, B&L and its subsidiaries did not, as a matter of general practice, register such copyrights in the United States or foreign countries.

## K. *Development of the International Soft Contact Lens Market*

B&L began to sell soft contact lenses in Canada late in 1971 and in various other foreign markets late in 1972. However, B&L was not the first company to sell soft contact lenses outside the United States.

In 1971, NPDC, Hydron Europe, and Smith & Nephew Associated Co., Ltd., formed a new company, Hydron Lens Ltd., to manufacture and sell soft contact lenses in all European countries except France.

In 1972, NPDC and its affiliates began manufacturing and selling soft contact lenses throughout Europe. Shortly thereafter, NPDC and its affiliates began selling soft contact lenses in Japan and manufacturing and selling soft contact lenses in Australia. According to NPDC's 1975 Annual Report and Securities and Exchange Commission 10K Report, NPDC had, inter alia, the following market shares in 1975:

| | |
|---|---|
| Australia | 75 percent |
| United Kingdom | 50 percent |
| Spain | 80 percent |

Thus, when subsidiaries of B&L entered a foreign soft contact lens market, such subsidiaries generally had competitors. By 1977, most foreign affiliates of B&L were established as competitors in the respective foreign soft contact lens markets. B&L's foreign affiliates typically were the third or fourth largest competitor in their respective markets.

Each foreign affiliate of B&L which sold soft contact lenses maintained its own marketing, sales, and distribution departments which performed certain marketing, sales, and distribution activities with respect to its sales of soft contact lenses.

In 1977 and 1978, B&L sold standard soft contact lenses to its foreign affiliates at a transfer price of $6.70 per lens. By 1979, B&L was also selling to its foreign affiliates its thin soft contact lenses, which practitioners sold to customers at a price higher than the standard soft contact lenses. Rather than maintaining separate transfer prices for standard soft contact lenses and thin soft contact lenses, B&L established in 1979 a single uniform transfer price of $7.50 with respect to all sales of soft contact lenses to foreign affiliates. This price remained in effect until 1983, when the intercompany transfer price was reduced to $6.50.

### III. Historical development of the Irish operations of B&L Ireland

#### A. *Background of Decision to Establish Foreign Manufacturing Facility*

Prior to 1980, B&L and its subsidiaries had no manufacturing facilities, other than the Rochester Facility, which had the ability to produce soft contact lenses using the spin cast process. Therefore, all soft contact lenses produced using the spin cast process and sold to B&L's foreign marketing subsidiaries were manufactured in Rochester.

B&L's long range forecasts prepared in 1978 and 1979 with respect to the foreign markets predicted that the demand for soft contact lenses in such markets would increase in 1980 and future years, particularly in Europe. B&L expanded its manufacturing and distribution capacity at the Rochester Facility to in part meet this expected increase in demand. The expansion of manufacturing capacity was accomplished in part by increasing the number of spindles on certain of its spin cast machines from 16 to 24 spindles.

Additional long range forecasts conducted in 1980 predicted approximately 20-percent per year growth in both the domestic and international market for soft contact lenses from 1981 through 1985. B&L also contemplated in 1980 that its share of the United States contact lens market would increase as a result of its various marketing strategies in the late 1970's and early 1980's.

B&L's 5-year strategic plan in 1980 projected the following demand for contact lenses in the United States and international markets:

| Year | Gross demand soft contact lens units | Net demand soft contact lens units |
|------|------|------|
| 1981 | 14,200,000 | 9,230.000 |
| 1982 | 16,800,000 | 10,920,000 |
| 1983 | 19,100,000 | 12,415,000 |
| 1984 | 19,400,000 | 12,610,000 |
| 1985 | 20,700,000 | 13,455,000 |

The "gross" demand refers to the number of lens-in-mold units needed in order to net a sufficient number of saleable units to meet the projected market demand for soft contact lenses. For planning purposes, B&L utilized a 35-percent yield loss factor. In 1980, after addition of the 24 spindle spin cast machines and other increases in capacity, the Rochester facility had a maximum gross manufacturing capacity of approximately 17 million units. However, as a matter of corporate policy, B&L assumed operation of the Rochester facility at 65 percent of capacity in order to maintain a safety margin of 35 percent of full capacity so that B&L could move quickly to meet any unexpected surge in demand and to have a margin of safety for peak demands, production problems, shutdowns, and other manufacturing difficulties. Thus, for planning purposes, B&L considered the Rochester facility as capable of producing just over 7 million saleable units. The Soflens Division management determined that it would require substantial additional manufacturing capacity in order to meet demand through the early and mid-1980's.

A factor in situating the additional capacity was B&L's concern that concentration of virtually all its soft lens manufacturing capability at one location overly exposed it to risks that natural or man-made disasters or labor problems could shut down the Rochester facility and virtually eliminate petitioners' ability to supply soft contact lenses to the United States and foreign markets. Thus a decision was reached that any additional manufacturing capacity established should be located at a site other than the Rochester facility. A European location for the new manufacturing operation had the additional attraction of

providing a closer source of supply for B&L affiliates in Europe, where particularly strong increases in soft contact lens demand were predicted.

Another significant factor in the decision to site additional capacity overseas rather than expanding the Rochester facility or establishing a manufacturing facility elsewhere in the United States was based on regulatory considerations. Most foreign countries did not have as strict regulatory environments as that imposed in the United States by the FDA. A location outside the United States would permit the manufacture of lenses made of new materials for foreign markets prior to the obtaining of FDA approval for sale of these products within the United States. Upon receiving FDA approval, these new lenses could immediately be introduced into the United States without manufacturing start up delays.

## B. *Investigation of and Decision to Establish an Overseas Manufacturing Facility*

During 1978 and 1979, B&L investigated generally the possibility of locating a contact lens manufacturing facility at several possible locations both within and outside the United States. On June 10, 1978, a planning team (Overseas Task Force) was established for the purpose of determining the factors to be considered in B&L's 5-year plan with respect to an overseas manufacturing facility. On October 19, 1978, several members of the Overseas Task Force met in Rochester with Mr. Olaf O'Duill, a representative of the Industrial Development Authority of the Republic of Ireland (IDA) to discuss the various financial and other incentives available to corporations doing business in Ireland. The IDA is responsible for promoting industrial development in the Republic of Ireland. The IDA's principle objective is to encourage Irish industrialists and foreign industrialists to establish operations in Ireland.

On November 3, 1978, the Overseas Task Force issued a report (Stage I report) in which it stated that it envisioned that the proposed overseas manufacturing facility would produce HEMA soft contact lenses for the foreign market and new products for the total international market. It also contemplated that the overseas facility would be FDA

approved so that overseas production could be shipped to the United States to sustain the domestic market for a short time should production at the Rochester facility be interrupted.

The second stage of the analysis of an overseas manufacturing facility, which commenced on or about October 19, 1978, was originally intended to compare the financial considerations relevant to a manufacturing facility located in variuos locations, but was ultimately limited to an evaluation with respect to the Republic of Ireland. Ireland was chosen as a site for further investigation based on the IDA's program of investment incentives and Ireland's membership in the European Economic Community.

On March 26, 1979, the Overseas Task Force issued a report (Stage II report) which reviewed the various capital and training grants provided by the IDA, financial incentives, Irish tax incentives, and location savings available to an Irish business operation. On October 18, 1979, the Soflens Division submitted to the B&L board of directors a proposal for Soflens manufacturing facility in Ireland which proposed certain capital expenditures for the establishment of a new manufacturing facility in Waterford, Ireland. The project was authorized by the B&L board of directors in October 1979. On October 15, 1980, a Special Expenditure Application with respect to the Irish lens facility was submitted to B&L management. It contained formal cost and profitability projections and served as a financial justification to B&L management of the proposed capital expenditures.

C. *Negotiations and Agreement Among Petitioners, B&L Ireland, and the Industrial Development Authority of the Republic of Ireland*

On or about July 24, 1979, B&L submitted to the IDA a general project outline for an Irish manufacturing facility. On August 1, 1979, the IDA provided indications of grant support with respect to facilities located in the following Irish cities: Dublin, Cork, Mullingar, Tullamore, and Waterford. B&L selected Waterford, Ireland, because the IDA and the Irish government offered (i) the highest capital grant of 45 percent of the total investment for facilities in

Waterford, (ii) low-cost lease financing on 35 percent of the total investment, (iii) training grants to cover the cost of training employees of the operation, (iv) low-cost "section 84" financing available through Irish banks, (v) a partially completed "advance" building in Waterford, and (vi) a tax holiday on all export profits through 1990.

In early 1980, B&L submitted to the IDA an Industrial Proposal for the establishment of manufacturing operations in Ireland (IDA Proposal). The IDA Proposal anticipated that B&L Ireland would manufacture approximately 1,500,000 and 3 million gross HEMA contact lenses in 1981 and 1982, respectively, and would have sales of approximately 800,000 and 1,800,000 HEMA contact lenses in 1981 and 1982, respectively. It was contemplated that all of these lenses would be sold to foreign affiliates of B&L. No sales to B&L itself were then contemplated. The IDA Proposal indicates that after an initial start up phase, the Waterford facility would have a maximum production capacity for HEMA soft contact lenses of 5 million gross lenses, or a net yield of 3,250,000 saleable lenses after giving effect to a yield loss factor of approximately 35 percent.

The IDA Proposal was presented as a four-phase project to be implemented over a 7-year period. Phase One contemplated the establishment of a facility for manufacture of B&L's First Fit System of Soflens Contact Lenses. The series of lenses incorporated in the First Fit System included both thin and standard thickness lenses which would satisfy the requirements of over 90 percent of potential contact lens users.

The Second Phase of the project contemplated establishment of manufacturing facilities for a second-generation lens B&L intended to develop as a replacement for the Soflens lens.

Phase Three was expansion of the Phase Two manufacturing facility to meet projected worldwide demand (including in the United States market) as the second-generation lens gained wider acceptance.

The fourth and final phase was the planned renovation of the Phase One facility to accommodate manufacture of the second-generation lens. B&L anticipated that by this stage

the second-generation lens would be widely accepted and demand for the Soflens lens would deteriorate as that lens became obsolete. Through 1982, however, only the first phase of the project had been implemented.

On or about February 10, 1981, B&L, B&L Ireland, and the IDA entered into an agreement pursuant to which the IDA agreed to provide certain grants and other benefits to B&L Ireland (IDA Agreement). Pursuant to the IDA Agreement, B&L Ireland received from the IDA in 1981 and 1982 capital grants in the amount of approximately 45 percent of its initial investment in the Waterford facility and the equipment installed therein. Also pursuant to the IDA Agreement, B&L Ireland agreed not to enter into any royalty commitments, except that B&L Ireland could pay royalties to B&L or any subsidiaries in an amount not to exceed 5 percent of B&L Ireland's annual net sales. In the preamble to the IDA Agreement, B&L represented that to the best of its belief, there would be available to B&L Ireland the raw materials, business and technical personnel, knowledge and facilities required for the proper establishment of operations. In 1981 and 1982, B&L Ireland received training grants with respect to the training of B&L Ireland employees. Such grants generally covered training costs, including, inter alia, compensation and expenses for instructors, transportation, and salaries for trainees.

The IDA Agreement required B&L Ireland to fulfill certain obligations as a condition to the capital grants and other incentives provided by the IDA. In particular, B&L Ireland was obligated to operate its manufacturing facility within the specific parameters outlined in the IDA Proposal. Additionally, B&L Ireland was required to commence production at the Waterford facility by December 31, 1981, and continue operating thereafter. The contingent liability undertaken by B&L Ireland for repayment of grants was reduced by one-tenth on each anniversary of the grant payment provided B&L Ireland's obligations under the IDA Agreement were being satisfied. The IDA Agreement was severable such that a failure to proceed as to any of the late phases of the project would have no effect as to earlier phases.

D. *Manufacturing Intangibles Related to Spin Casting and Soft Contact Lens Products*

1. Technology in the Public Domain

Through 1982, no patents had ever been issued under the laws of the Republic of Ireland to Dr. Wichterle, CAS, NPDC or any of its subsidiaries, or B&L or any of its subsidiaries with respect to the soft contact lens, the HEMA soft contact lens material, the spin cast process, the lathing process, or any other related manufacturing processes. Therefore any individual or entity had the legal right to manufacture, use, and sell soft contact lenses in Ireland using the technology represented by the Wichterle materials patents and the Wichterle spin cast patents without infringing on any patent rights. As noted above, the Wichterle materials patents expired on November 30, 1982, and Wichterle Spin Cast Patent I, Wichterle Spin Cast Patent II, and the Wichterle Xerogel Spin Cast Patent expired on January 2, 1985.

2. B&L License of Trade Secrets to B&L Ireland

On or about January 1, 1981, B&L entered into an agreement with B&L Ireland pursuant to which B&L granted to B&L Ireland a nonexclusive license to use certain manufacturing intangibles in the manufacture of soft contact lenses and certain other rights (B&L Ireland License Agreement).

Pursuant to the B&L Ireland License Agreement, B&L granted to B&L Ireland a nonexclusive license to make use of all B&L owned Irish patents and all other technical information and know-how possessed by B&L which relates to contact lenses, the materials used in the production thereof, and the methods and apparatus used in contact lens manufacture to manufacture or use contact lenses in Ireland, and to sell contact lenses anywhere in the world. B&L Ireland also became entitled to any improvements resulting from B&L's ongoing research and development in the manufacture of contact lenses. The agreement also included a nonexclusive license for B&L Ireland to sell contact lenses anywhere in the world using the names Bausch & Lomb and Soflens and any other B&L trademarks registered in Ireland by B&L in connection with the

marketing of contact lenses. The agreement also granted B&L Ireland the right to use Bausch & Lomb in the company's name. B&L Ireland was prohibited to sublicense any of the rights it acquired in the license agreement. In exchange for these rights, B&L Ireland agreed to pay B&L a royalty equal to 5 percent of net contact lens sales. The agreement also stipulated that it was terminable at any time by either party on the giving of written notice.

## E. *Financing of the Irish Operation*

### 1. Section 84 Financing

Section 84 of the Irish Corporation Tax Act of 1976 provides that under certain circumstances, Irish banks may receive loan interest tax free. This induces Irish banks to provide favorable interest rates to Irish companies. B&L Waterford, the parent of B&L Ireland, was able to secure section 84 financing and to loan such funds to B&L Ireland. B&L Waterford was important to the above structure, since a non-Irish company could not receive section 84 financing and because a loan directly from an Irish bank to B&L Ireland would not have qualified for purposes of determining the amount of the matching IDA capital grant to be received by B&L Ireland. On or about March 9, 1981, B&L Waterford and Allied Irish Banks Ltd. (Allied) entered into a loan agreement that qualified under section 84, pursuant to which B&L Waterford borrowed from Allied $4,200,000, and concurrently loaned the money to B&L Ireland. On January 16, 1981, B&L Ireland and Allied entered into another loan agreement pursuant to which Allied agreed to make available to B&L Ireland, as required, up to $7 million.

### 2. Lease Financing Arrangements

Leasing arrangements at favorable terms were made available through certain Irish tax incentives to banks for the financing of machinery and equipment. The total amount of machinery and equipment which could be financed through such leasing arrangements, however, was limited to the lesser of 35 percent of total machinery and equipment costs or 20 percent of total fixed assets costs. Rather than purchasing all of the equipment required to

operate a contact lens manufacturing facility in Ireland, B&L Ireland leased certain equipment from Allied. On March 30, 1981, B&L Ireland and Allied entered into a Master Lease Agreement, and leased from Allied certain equipment used in the manufacture and processing of soft contact lenses at the Waterford facility.

F. *Establishment of Manufacturing Operations by B&L Ireland*

In 1980, B&L informally agreed to acquire from the IDA a partially complete building located in the IDA Industrial Estate in Waterford, Ireland. Bruce Dornan of B&L was assigned as an employee of B&L Ireland to supervise completion of the building and start-up of operations at the Waterford facility.

B&L Ireland purchased four spin cast machines from B&L in 1980, and an additional four spin cast machines in 1981. Each of the spin cast machines was installed at the Waterford facility, by employees of B&L Ireland's engineering department. B&L Ireland paid to B&L $60,024, plus packaging, handling, shipping, and insurance costs for each spin cast machine. Once the machines were installed in the Waterford facility, it was necessary to perform quality assurance and other preoperation tests to ensure that all aspects of the spin cast machine were operating properly, and to identify any operational or quality problems with each particular machine. Initial testing of the machines was conducted in Rochester. After installation in Waterford, additional testing was conducted by employees of B&L Ireland's quality assurance and engineering departments in accordance with test "protocols" adopted from B&L protocols.

B&L Ireland also purchased edging machines from B&L at a price of $10,235.51, plus packaging, handling, shipping, and insurance. Other items of equipment were also purchased from B&L. In each case, equipment sold to B&L Ireland which B&L purchased from independent vendors was priced at the full vendor price. Equipment fabricated by B&L or purchased from independent vendors and modified by B&L was priced in accordance with internal B&L memoranda which took into account direct costs,

overhead, and a profit factor. B&L Ireland also purchased certain parts and items of equipment directly from independent vendors in Ireland during each of the taxable years at issue.

B&L Ireland's purchase from B&L of various items of capital equipment permitted B&L Ireland to commence operations at a date much earlier than the date on which operations would have commenced if B&L Ireland had purchased such capital equipment from unrelated third parties. Manufacturing activities were begun in March 1981, although significant sales were not made until after FDA approval of the facility had been obtained in September 1981.

## IV. Operations of B&L Ireland in 1981 and 1982

### A. *Production Planning and Scheduling*

In 1981, B&L Ireland manufactured and sold five series of soft contact lenses, including the minus U3, minus U4, minus B3, minus B4, and minus F series lenses.[8] The lens series selected for production during this start-up phase were generally those series which were easiest to manufacture. During 1982, as B&L Ireland's manufacturing proficiency increased, B&L Ireland expanded the range of soft contact lenses which it manufactured and sold. In 1982, B&L Ireland manufactured and sold more than 10 series of daily wear soft contact lenses, although there were other daily wear soft contact lenses manufactured at the Rochester facility which were not manufactured by B&L Ireland.

In 1981 and 1982, employees of B&L Ireland prepared production schedules based primarily on the forecasted international demand for specific lens series, which were prepared by Soflens Division. The international marketing personnel generated the demand forecasts from sales and inventory information gathered from the various foreign subsidiaries of B&L. The international demand forecast was forwarded to the materials management manager of B&L

---

[8]The letter in a lens series manufactured by B&L designates the thickness of the particular lens, while the number refers to the lens diameter. The "minus" designation indicates the lens is for the correction of myopic (nearsighted) patients, while a "plus" designation indicates correction of hyperopic (farsighted) patients.

Ireland. The quantity of lenses to be produced by B&L Ireland was determined by the estimated capacity of the Waterford facility for the particular year. The mix of lenses to be produced, i.e., the quantity of lenses within each series of lenses to be produced by B&L Ireland, was determined by forecasted demand.

B. *Purchases of Raw Materials and Materials Policies*

B&L Ireland made efforts to locate local supplies of various raw materials including vials, rubber stoppers, labels, and styrofoam trays used for shipping. However, B&L Ireland continued to purchase substantial quantities of vials, caps, and stoppers from B&L because, inter alia, B&L could obtain volume discounts on the purchase of these items from independent vendors.

B&L Ireland purchased the liquid monomer mixture used in soft contact lens production from B&L. Since the Rochester facility was already equipped for the production of the monomer mix, there was no need for B&L Ireland to establish a separate laboratory of its own for production of the such monomer mix. B&L Ireland also purchased the plastic molds used in the manufacture of contact lenses from B&L.

In 1980, 1981, and 1982, the customs duties on goods sold by B&L to B&L Ireland were paid by B&L Ireland.

Orders for raw materials were communicated to vendors, including B&L, by purchase order. Raw materials used by B&L Ireland in the manufacture of contact lenses were stored in the warehouse, manufacturing, and mold storage rooms. Components were quarantined and, where appropriate, inspected, sampled, and tested prior to acceptance. Storage and inspection procedures generally similar to those performed by B&L Ireland were also performed by B&L at the Rochester facility.

C. *B&L Ireland's Manufacture of Soft Contact Lenses Using the Spin Cast Manufacturing Process*

In 1981 and 1982, B&L Ireland manufactured contact lenses of a particular Stock Keeping Unit (SKU) within a particular lens series in a batch or "lot" of approximately 400 to 900 lenses (Lot). The manufacture of a Lot of a

particular SKU within a lens series at the Waterford facility was initiated by a Lens Manufacturing Order (M.O.).

B&L Ireland materials management personnel recorded the necessary information for the manufacture of the specific series and SKU selected, including the mold radius, cycle time, spin speed, and monomer volume on the M.O. These specifications were originally determined by B&L when each SKU was introduced. B&L and B&L Ireland considered such information to be part of the technological information and know-how covered under the B&L Ireland License Agreement.

In 1980, 1981, and 1982, the manufacturing processes and related functions at the Rochester facility were generally similar to those processes and functions of B&L Ireland. Both involved a "dry process" and a "wet process." The spin cast processes, the various lathing processes, and the cast molding processes all involved both a "dry" process and a "wet" process.

### 1. The Dry Process

The first step in the "dry process," involves the formation of a contact lens "blank." The monomer mix is loaded onto the spin cast machine. Based on information recorded on the M.O., the machine operator adjusts the spin speed of the machine and the volume of monomer mix to be injected into the mold so as to produce the desired SKU and series of lens. The spin cast machine injects the appropriate amount of monomer mix into the mold cavity, and as the mold begins to spin the centrifugal force spreads the liquid monomer mix and conforms such material to the mold to form a spherical shape. As the mold continues to spin, the polymerization process begins to solidify the monomer mix in the mold into the shape of a contact lens. After polymerization is complete, the lenses attached to the molds leave the spin cast machine and are collected for edging. An operator places each mold-lens unit into an edging machine which automatically edges the lens with a diamond tool. The edging machine then carries the edged mold-lens unit on a rotating table to another portion of the machine which buffs the edges of the mold-lens unit to remove any residue on the unit. After inspection, a manufacturing operator

places edged and buffed mold-lens units into hydration trays, thus completing the last step in the "dry process." The edging process utilized by B&L Ireland was the subject of a United States process patent owned by B&L. Such processes, functions, and procedures were performed in a generally similar manner by employees of B&L at the Rochester facility. B&L Ireland and B&L considered such processes, functions, and procedures to be part of the technical information and know-how covered under the B&L Ireland License Agreement.

2. The Hydration Process

During the second stage of the manufacturing process, known as the "hydration stage" or "wet process," the lens absorbs a considerable amount of water, thus allowing the lens to soften and become pliable. Mold-lens units are collected in a hydration tray which is placed in a hot water hydration unit for a specified period of time until the lenses become loose in the molds. Manufacturing operators then remove the lenses from the molds and dip the lenses in distilled water.

3. The Lens Inspection and Packaging Processes

After the lenses in a Lot have been cleaned and rinsed, they are inspected with a comparator to determine whether the cosmetic specifications are satisfied. Lenses with nicks, tears, blotches, or any other defect are rejected and are not processed further. If any new or unusual defects arise, the inspector reports such defects to quality assurance. The cosmetic inspector places each acceptable lens into a saline-filled vial, and places a stopper in the mouth of the vial.

A sample of lenses which have passed cosmetic inspection are then placed into a vertometer to determine their optical power. If, as a statistical matter, the Lot cannot be assigned a single power, each lens in the Lot will be inspected to determine its power. After a complete Lot has been cosmetically inspected, placed in vials, and measured for power, quality assurance performs an audit on the Lot for cosmetic defects, power reading, and dimensions. Quality assurance delivers accepted lots to another area for crimping of the cap over the stopper in the vial.

In 1982, B&L Ireland acquired from an unrelated party an automated vial cleaning machine, which performs the vial cleaning task. Such machine was not employed by B&L at the Rochester facility.

After the vials containing inspected lenses are capped, crimped, and washed, they are sterilized. Sterilized, inspected lots are then delivered to the labeling area where each vial is labeled. The label must set forth, inter alia, the power, lot number, and expiration date applicable to the lens contained in the vial. Late in 1981, B&L Ireland began using an automatic labeling machine to label certain of its sterilized and inspected lots of lenses. The 1981 President's Report indicates that the expiration date labeling, one aspect of the labeling process, on certain lenses sold by B&L Ireland to B&L was done at the Rochester facility.

Once the labeling is completed all labeled vials are routed to final inspection. There the Lot is checked against the M.O. and each vial is inspected. Approved lenses are then transferred to quarantine. Upon verification by quality assurance testing of sterility of the lenses in the Lot, such lenses are released to materials management and placed in inventory.

4. Quality Assurance Procedures

B&L Ireland manufacturing department personnel performed extensive testing at each stage of the manufacturing process to assure the quality of the finished products. The quality assurance department performed a function which was quite different from this quality control function performed in the manufacturing department. The quality assurance department had the responsibility of assuring that the products manufactured and sold were quality products which satisfied the good manufacturing practice standards established by the FDA. Accordingly, the quality assurance department was required to maintain independence from the manufacturing and other departments. Thus, the B&L Ireland assurance manager reported to the Soflens Division as well as within B&L Ireland.

The primary responsibilities of the quality assurance manager included, inter alia, the following:

(i) Implementing quality assurance policies and procedures for inspecting raw materials, packaging materials, in-process, and finished product to assure that all products generated conformed to standards and specifications.

(ii) Monitoring, auditing, and supervising facilities and manufacturing operations for conformance with established procedures and requirements of the FDA and other governmental regulatory agencies.

(iii) Maintaining required records and documents, including, inter alia, formulae, quality assurance test results, inspections, archive samples, product disposition, regulatory inspections, standards, and specifications.

(iv) Coordinating regulatory agencies' inspection of B&L Ireland's manufacturing operations with assistance, as needed, from the B&L regulatory affairs department at the Rochester facility.

The quality assurance department was also charged with the responsibility of preparing, maintaining, and revising the device master record. The device master record is the governing document for the manufacture of soft contact lenses, and was prepared to outline the good manufacturing practice standards mandated by the FDA in the manufacture of soft contact lenses. The device master record describes the basic facilities, operations, procedures, and controls used in manufacturing and packaging of soft contact lenses and discusses the quality assurance functions. The device master record also serves as a document which references all applicable and approved specifications, procedures, and forms used in the manufacture of soft contact lenses. B&L Ireland's device master record was prepared in 1981 by employees of B&L Ireland. Since prior to 1981, a device master record was maintained by B&L at the Rochester facility relating to soft contact lenses. B&L Ireland's quality assurance department was also responsible for maintaining the standard operating procedures for all other functions performed by the various departments of B&L Ireland.

## D. *B&L Ireland's Engineering Functions*

In 1981 and 1982, B&L Ireland's engineering department had, inter alia, the following responsibilities: (i) Maintenance

of the Waterford facility and necessary modifications thereto; (ii) engineering with respect to the manufacturing and other processes; and (iii) preventative and corrective maintenance with respect to all equipment used in the manufacturing and other processes of B&L Ireland. B&L Ireland engineers were involved in the correction of problems encountered in the construction of the Waterford facility, including a faulty water system, ventilation problems, and leaking walls. As a result of continuing problems with the water system, a complete new water system was designed and installed at the Waterford facility of B&L Ireland, including a stainless tank and pipework, a pump arrangement, and a filter arrangement. B&L Ireland's engineering department was also charged with the responsibility for performing the test procedures with respect to equipment housed in the Waterford facility.

In 1981, B&L Ireland began investigating the acquisition from an unrelated supplier of an automatic machine which would automatically clean vials, fill each vial with a saline solution, and insert into each vial a rubber stopper. Subsequently, B&L Ireland acquired an automated machine which cleaned and sterilized each vial, transported each cleaned and sterilized vial along a conveyor to be filled with a saline solution, and placed on each vial a rubber stopper. Employees of B&L Ireland installed the automatic machine at the Waterford facility.

In 1982, B&L Ireland performed certain process engineering activities with respect to the spin cast process and the production of soft contact lenses. For instance, in June 1982, B&L Ireland employees installed and began testing a lift-pin height detector system for the edging machines. The lift-pin height detector system was designed to provide early warning of unedged lenses due to improper lift-pin operation.

In October 1982, B&L Ireland fitted a conveyor onto an automatic labeling machine previously in use in the manufacturing process. Such conveyor permitted the post-labeling inspection to be performed in-line with the labeling.

In November 1982, B&L Ireland adopted a method of installing and removing tray-closure pins, which reduced the incidence of folded lenses in the thin series of lenses.

In December 1982, B&L Ireland commenced an evaluation of the finger cleaning of lenses to determine the effect of finger cleaning on the quality of the final product. After performing statistical analysis of the results of such tests, B&L Ireland determined in 1983 that the cosmetic finger cleaning process was not necessary to ensure a quality product.

In late 1982, B&L Ireland adopted a procedure for presampling suspect defective lots prior to the wet process. Such sampling permitted B&L Ireland to halt processing of defective lots prior to incurring additional processing expenses with respect to such defective lots.

### E. B&L Ireland's Sales of Soft Contact Lenses

In 1980, 1981, and 1982, B&L produced approximately 8,135,400, 7,135,600, and 5,196,000 daily wear soft contact lenses, respectively. B&L sold approximately 4,148,000, 5,354,000, and 5,264,000 daily wear soft contact lenses in 1980, 1981, and 1982, respectively, in the United States. The average realized price (ARP) for sales of daily wear soft contact lenses to unrelated parties in the United States was $16.74 and $15.25 in 1981 and 1982, respectively. B&L's foreign subsidiaries sold approximately 1,474,000 and 1,803,000 daily wear soft contact lenses in 1981 and 1982 at ARP's of $22.03 and $18.41, respectively.

In 1981 and 1982, B&L Ireland produced approximately 1,338,000 and 3,958,000 daily wear soft contact lenses, respectively. In 1981 and 1982, B&L Ireland sold daily wear soft contact lenses in the following amounts and sales volumes:

| Year | Soft contact lens units sold by B&L Ireland | Soft contact lens total sales by B&L Ireland |
|------|------|------|
| 1981 | 1,116,000 | $8,373,000 |
| 1982 | 3,694,000 | 27,370,000 |

Of B&L Ireland's total sales, 680,106 units (61 percent) and 2,056,435 units (56 percent) in 1981 and 1982, respectively, were sold to B&L for resale in the United States market. However, there was no contractual obligation which required B&L or any of its affiliates to purchase any lenses produced by B&L Ireland.

F. *Pricing Policy With Respect to Intercompany Sales After Establishment of B&L Ireland*

In 1981 and 1982, B&L Ireland sold daily wear soft contact lenses in Ireland to B&L and foreign affiliates of B&L for $7.50 per lens. The purchaser paid freight, duties, freight insurance, and packing charges and customs duties with respect to soft contact lenses sold by B&L Ireland. Duty and freight charges for B&L Ireland lenses shipped to B&L were $0.62 per lens in 1982. Such policies applied to sales of soft contact lenses by B&L to foreign affiliates of B&L during such years as well. B&L began using an intercompany transfer price of $7.50 per lens in 1979. The intercompany transfer price was subsequently reduced to $6.50 per lens in 1983 to reflect reduced market prices as a result of increased competition.

B&L Ireland did not have a formal procedure for collecting overdue accounts. Since B&L Ireland sold soft contact lenses only to B&L and foreign affiliates of B&L, it had little need for such a procedure. Nor did B&L Ireland have a marketing department or engage in any media advertising outside of Ireland in 1981 or 1982.

G. *Royalties Paid by B&L Ireland to B&L in 1981 and 1982*

In 1981 and 1982, B&L Ireland paid royalties to B&L in the amounts of $418,669 and $1,368,000, respectively, with respect to B&L Ireland's sales of soft contact lenses manufactured at the Waterford facility. Such amounts equaled 5 percent of B&L Ireland's sales of contact lenses in each year.

V. Sales of Soft Contact Lenses by Other Manufacturers During 1981 and 1982

During the years 1981 and 1982, B&L functioned as the distributor in the United States of the contact lenses which it purchased from B&L Ireland during those years. All manufacturing, processing, packaging, and other activities necessary to prepare the lenses for sale to optical practitioners and chains in the United States were performed in Ireland by B&L Ireland.[9] B&L had a general policy of

---

[9] We discount the significance of any expiration date labeling of a limited number of B&L Ireland lenses which may have been done by B&L in Rochester during 1981.

selling only to practitioners and chains rather than other distributors.

During the years 1981 and 1982, the soft contact lens market in the United States was highly competitive. Although B&L remained dominant, it shared the market with eight to ten other major participants (i.e., market share in excess of 1 percent). The daily wear standard and thin lenses produced by B&L and B&L Ireland were generally fungible and interchangeable with the standard and thin soft contact lenses produced by their competitors. B&L lenses were perceived to be superior by some in the industry due to the better reproductibility of lenses manufactured using the spin cast process. A brief description of representative sales made by independent manufacturers to competing distributors follows.

A. *American Sterilizer Co. (Lombart)*

During 1981 and 1982, American Sterilizer Co. (also known as Lombart) manufactured contact lenses in the United States for sale to optical practitioners, optical chains, and distributors. The Lombart lens was made from a HEMA-based material known as Deltafilcon through use of a lathing method. Lombart sold standard and thin soft contact lenses to optical practitioners under the trademarks "AMSOF" and "AMSOF THIN," respectively. These lenses generally sold at discounts of approximately 20 percent off list prices of $16 and $18, respectively. Lombart sold lenses to distributors for resale using the trade names Deltacon and Deltacon XT and on a private label basis, i.e., bearing the distributor's private label instead of a Lombart trade name. During the years 1980, 1981, and 1982, Lombart entered into a number of distribution contracts for the sale of Deltacon or private label lenses to various unrelated distributors. These agreements and their basic terms were as follows:

| Distributor of soft contact lenses | Date of agreement | Minimum annual No. of lenses | Price per lens |
|---|---|---|---|
| 1. X-Cel Contact Lens, Inc. | June 1980 | 30,000 | $8.00 |
| 2. Sakura Contact Lens | August 1980 | 18,000 | 8.75 |
| 3. Aire-Con Laboratories | September 1980 | 30,000 | 8.00-9.00 |
| 4. Art Optical Contact Lens, Inc. | November 1980 | 30,000 | 8.00-9.00 |
| 5. Carolina Contact Lens, Inc. | November 1980 | 30,000 | 8.00-9.00 |

| Distributor of soft contact lenses | Date of agreement | Minimum annual No. of lenses | Price per lens |
|---|---|---|---|
| 6. Bailey-Smith Corp. | December 1980 | 50,000 | 7.50-8.45 |
| 7. Winchester Optical | December 1980 | 30,000 | 8.00-9.00 |
| 8. Art Optical Contact Lens, Inc. | January 1981 | 12,000 | 9.75-10.00 |
| 9. Global Optics, Inc. | February 1981 | 50,000 | 7.50-8.45 |
| 10. X-Cel Contact Lens, Inc. | August 1981 | 40,000 | 7.50-8.45 |
| 11. ICN Pharmaceutical Holland B.V. | December 1981 | 25,000 | 7.50-8.45 |
| 12. Breger-Mueller Welt Corp. | May 1982 | 40,000 | 8.50 |
| 13. Global Optics, Inc. | May 1982 | 40,000 | 8.50 |
| 14. X-Cel Contact Lens, Inc. | May 1982 | 30,000 | 8.95 |
| 15. Winchester Optical | May 1982 | 20,000 | 9.95 |
| 16. Soderberg Contact Lens, Inc. | August 1982 | 12,500 | 10.45 |
| Total Lenses | | 487,500 | |

Agreements 1. and 2. were for the purchase of standard thickness lenses only. In Agreements 3. through 11., the lower price is for standard thickness lenses while the higher price is for thin lenses. Agreements 12. through 16. had a single price for both standard and thin lenses. All of the agreements allowed the distributor to use the Deltacon and Deltacon XT names but not the AMSOF or AMSOF THIN trade marks, except for Agreements 11. and 12. which are private label agreements. Agreements 13. through 16. specify that the prices are subject to change in the event Lombart began paying royalties to NPDC. Many of the agreements also provided that the sales price would be adjusted pursuant to a sales-volume schedule should the actual number of lenses purchased during the term of the agreement be below the specified minimum.[10]

## B. *National Patent Development Corp. (American Hydron)*

During 1981 and 1982, NPDC manufactured both standard and thin daily wear contact lenses in the United States for sale to optical practitioners, chains, and unrelated distribu-

---

[10]The distribution agreements which charged a single price per lens whether standard thickness or thin, contained the following price-volume schedule:

| Price per lens | Annual volume |
|---|---|
| $10.95 | 10,000-14,999 |
| 10.45 | 15,000-19,999 |
| 9.95 | 20,000-24,999 |
| 9.45 | 25,000-29,999 |
| 8.95 | 30,000-39,999 |
| 8.50 | 40,000 and over |

tors. The lenses were made of a HEMA-based material using both the lathing process and the cast molding process. NPDC marketed its standard and thin daily wear soft contact lenses under the trademarks "MINI Lens" and "ZERO 6," respectively. NPDC also entered into private label agreements whereby its soft contact lenses were sold without the NPDC trademarks. Distributors who purchased lenses under private label agreements sold lenses under their own name.

### 1. Sales Under Trademarks of NPDC and its Affiliates

On or about April 13, 1979, NPDC entered into a Distribution Agreement with Mid-South Soft Contact Lens, Inc. (Mid-South). Pursuant to the agreement, Mid-South agreed to purchase soft contact lenses from NPDC in 1980 pursuant to the following volume/price schedule:

| No. of lenses purchased | Purchase price per lens |
|---|---|
| 8,625 | $17 |
| 17,250 | 16 |
| 25,875 | 15 |
| 34,500 | 14 |

During 1980, 1981, and 1982, Southern Optical Co. (Southern) was a manufacturer and distributor of eyeglasses, contact lenses, and opthalmic instruments. Southern manufactured hard and rigid gas permeable contact lenses, but not soft contact lenses. During 1981 and 1982, Southern purchased soft contact lenses from NPDC and various other manufacturers for resale to optical practitioners and chains under the manufacturer's name. Southern sold between 50,000 and 60,000 soft contact lenses per year during this period in a six- or seven-State area in the mid-Atlantic and Southeastern United States.

During 1981 and 1982, Southern purchased between 20,000 and 30,000 soft contact lenses from NPDC pursuant to a distribution agreement. This agreement entitled Southern to purchase NPDC soft contact lenses at a discount of upto 40 percent off the NPDC list price.[11] The list price of

---

[11]The distribution agreement provided for a four-level pricing structure, with greater discounts based on greater volumes. Since Southern purchased in excess of 15,000 lenses from NPDC each year it was entitled to the highest discount available.

lenses sold by NPDC were approximately $25 to $27 per lens. Thus the agreement entitled Southern to purchase these lenses for approximately $15 to $16 per lens. Southern resold these lenses to optical practitioners for approximately $25 per lens.

In 1981, NPDC offered to sell its standard and thin daily wear soft contact lenses to its distributors at a flat $15 per lens.

### 2. Private Label Sales by NPDC and its Affiliates

During 1981 and 1982, Omega Optical Co. (Omega) was a manufacturer and wholesaler of eyeglasses and hard contact lenses. On January 1, 1981, Omega entered into a private label agreement with NPDC whereby Omega agreed to purchase, for resale under its "Omega Soft" trade name, a minimum of 25,000 soft contact lenses per year at prices ranging from $12 to $16 per lens based upon the following monthly lens volume schedule:

| Monthly lens volume | Standard | Thin |
|---|---|---|
| 0-999 | $15 | $16 |
| 1,000-1,999 | 14 | 15 |
| 2,000-2,999 | 13 | 14 |
| 3,000 and above | 12 | 13 |

The agreement offered rebates of $1 per lens if annual lens volume under the agreement exceeded 50,000 lenses, and $2 per lens if annual volume exceeded 75,000 lenses. This agreement constituted Omega's first experience in the soft contact lens market and was the first private label agreement it had ever entered into.

### C. *American Optical Corp.*

During 1980, 1981, and 1982, American Optical manufactured and sold standard and thin soft contact lenses under the "AO Soft" and "AO Thin" trade names, respectively. These lenses were composed of a HEMA-based material and were manufactured using both a lathing and a cast molding process.

During 1981 and 1982, American Optical offered its AO Soft and AO Thin soft contact lenses for sale to distributors for $16 per lens. In 1982, American Optical offered discounts ranging from 5 to 15 percent of the $16 price to

distributors whose 1982 volume exceeded 1981 volume by 15 percent or more. During 1981 and 1982, Bailey-Smith and Mid-South were among the distributors who purchased American Optical lenses. During 1982, Bailey-Smith resold these lenses to optical practitioners at a price of $21.60 per lens. Mid-South resold American Optical lenses for $21 per lens.

### D. *Hydrocurve (Soft Lenses, Inc.)*

Between 1980 and 1982, Hydrocurve (and its predecessor Soft Lenses, Inc.) sold and manufactured, inter alia, 45- and 55-percent water content soft contact lenses under the Hydrocurve II trademark. Hydrocurve II lenses were composed of a HEMA-based material and were manufactured using a lathing process.

During 1980, Hydrocurve sold its Hydrocurve II lenses to distributors at the following prices:

|  | 45-percent water content | 55-percent water content |
| --- | --- | --- |
| With replacement policy | $24.25 | - - - |
| Without replacement policy | 17.00 | $20 |

Bailey-Smith entered into a Distributorship Agreement with Hydrocurve with respect to Hydrocurve II lenses in 1980. Bailey-Smith purchased Hydrocurve II (45-percent water content) and Hydrocurve II (55-percent water content) soft contact lenses from Hydrocurve for $17 and $20, respectively. These lenses were then resold to optical practitioners in the United States market for $21.95 and $29.50, respectively.

During the years 1980 though 1982, Hydrocurve was Southern's largest supplier of contact lenses, selling approximately 30,000 Hydrocurve lenses during this period. Southern paid approximately $17 to $17.50 for Hydrocurve lenses which it resold to optical practitioners for approximately $23 per lens. Lenses purchased by Southern from Hydrocurve came with a product warranty, but did not include a performance warranty.[12]

---

[12]Product warranties, which relate to the quality and parameters of the lens were offered by most competitors in the soft contact lens business. The suitability of a particular lens for a particular customer is warranted under a performance warranty. Performance warranties were not standard in the business, although Southern sometimes purchased and resold lenses with a performance royalty.

E. *Other Manufacturers*

Southern purchased soft contact lenses from various other manufacturers in addition to NPDC and Hydrocurve both pursuant to distributor agreements and otherwise. In determining which manufacturer from whom to purchase lenses, Southern looked for a good, marketable product and a relationship with the manufacturer which allowed Southern to maintain a reasonable profit margin of between 25 and 40 percent.

Southern Optical purchased B&L soft contact lenses although a formal distribution relationship between the two companies did not exist. Southern Optical generally purchased the most popular B&L daily wear lenses for prices in the $14 to $15 range. These lenses were resold to optical practitioners for approximately $20 per lens. Due to the lack of a formal distribution agreement with B&L, Southern Optical purchased far fewer lenses from B&L than it did from manufacturers with which it had such a relationship. At trial, Thomas Sloan, president of Southern testified he would have "enjoyed" being able to purchase B&L soft contact lenses at the $7.50 price at which such lenses were offered to B&L by B&L Ireland.

The lowest price at which Southern was able to purchase soft contact lenses from a manufacturer was $11.17 per lens which it paid Alcon for its "Tre soft" lens.

VI. Respondent's Proposed Adjustments

On or about December 30, 1985, respondent timely issued a statutory notice of deficiency to petitioners relative to petitioners' 1979, 1980, and 1981 taxable years. In paragraph (ii) in respondent's statutory notice, respondent increased B&L's 1981 and 1982 United States consolidated taxable income in the amounts of $2,778,000 and $19,793,750, respectively, by allocating such amounts of income in those years from B&L Ireland to B&L. Respondent explained in the notice of deficiency that the allocation was made under section 482 in order to reflect an arm's-length consideration for the use of B&L's intangible assets by B&L Ireland. The allocation was calculated to give B&L Ireland a net profit before taxes on its manufacturing

activities of 20 percent of sales. In paragraph (jj) of the statutory notice, respondent made a correlative adjustment to petitioners' income by eliminating royalty income of $418,669 and $1,368,000 shown on petitioners' 1981 and 1982 returns, respectively, as having been received from B&L Ireland.

In respondent's answer to petitioners' petition, he alleged that an allocation under section 482 was also necessary to clearly reflect income and to prevent the evasion of taxes which allegedly resulted because of the lack of arm's-length pricing between B&L and B&L Ireland.

OPINION

Introduction

Section 482 authorizes respondent to allocate income between controlled enterprises if he determines that such an allocation is necessary to prevent evasion of taxes or clearly to reflect the true income of the controlled enterprises.[13] The purpose of section 482 is to prevent the artificial shifting of the true net incomes of controlled taxpayers by placing controlled taxpayers on a parity with uncontrolled, unrelated taxpayers. *Commissioner v. First Security Bank,* 405 U.S. 394, 400 (1972); see *W. Braun Co. v. Commissioner,* 396 F.2d 264, 266 (2d Cir. 1968), revg. and remanding T.C. Memo. 1967-66; sec. 1.482-1(b)(1), Income Tax Regs.

Respondent's authority to make allocations under section 482 is broad. *Edwards v. Commissioner,* 67 T.C. 224, 230 (1976); *PPG Industries v. Commissioner,* 55 T.C. 928,

---

[13]Sec. 482, as in effect for the years in issue, provides as follows:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Sec. 1231(e)(1) of the Tax Reform Act of 1986 amended sec. 482 to provide that "in the case of any transfer (or license) of intangible property * * *, income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." However, this amendment is effective only with respect to taxable years beginning after Dec. 31, 1986, and only with respect to transfers of intangibles that occurred after November 16, 1985, or licenses granted after such date. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1231(g)(2)(A) (1986) 100 Stat. 2085, 2563.

990-991 (1970). Respondent's section 482 determination must be sustained absent a showing that he has abused his discretion. *Paccar Inc. v. Commissioner,* 85 T.C. 754, 787 (1985), affd. 849 F.2d 393 (9th Cir. 1988). The taxpayer thus bears the heavier than normal burden of proving that respondent's section 482 allocations are arbitrary, capricious, or unreasonable in order for us to redetermine the deficiency. *Your Host, Inc. v. Commissioner,* 489 F.2d 957 (2d Cir. 1973); *G.D. Searle & Co. v. Commissioner,* 88 T.C. 252, 359 (1987). Whether respondent has exceeded his discretion is a question of fact. *American Terrazzo Strip Co. v. Commissioner,* 56 T.C. 961, 971 (1971). In reviewing the reasonableness of respondent's allocation under section 482, we focus on the reasonableness of the result, not the details of the methodology employed. *Eli Lilly & Co. v. United States,* 178 Ct. Cl. 666, 676, 372 F.2d 990, 997 (1967).

For purposes of section 482, the terms "tax avoidance" and "tax evasion" are interchangeable. *Asiatic Petroleum Co. v. Commissioner,* 79 F.2d 234, 236 (2d Cir. 1935). Respondent's determinations have been upheld where the challenged transactions were arranged solely to avoid taxes and without a valid business purpose. *Asiatic Petroleum Co. v. Commissioner, supra.*

Even in the absence of tax avoidance motives, respondent may make allocations under section 482 in order to clearly reflect the respective incomes of members of the controlled group. *Central Cuba Sugar Co. v. Commissioner,* 198 F.2d 214, 215-216 (2d Cir. 1952), revg. and remanding on this issue 16 T.C. 882 (1951). Thus establishment of a business purpose for a transaction does not necessarily insulate the taxpayer from a section 482 allocation. *Eli Lilly & Co. v. United States,* 372 F.2d at 998-999.

We have found as fact that petitioners had sound business reasons for the establishment of B&L Ireland. Petitioners had reason to believe that manufacturing capacity at its Rochester facility was inadequate to meet expected increases in soft contact lens demand. Petitioner determined that it was prudent to establish additional manufacturing capacity overseas in order to minimize regulatory delays, establish an alternative supply source to the Rochester facility, and to have a facility capable of more

efficiently servicing the increasingly important European markets. Ireland was determined to be the location at which these objectives could be realized most cost effectively due to the incentives offered by the Republic of Ireland to induce the location of manufacturing facilities within the Republic. Since a non-Irish company could not receive section 84 financing, there were sound business reasons for incorporating an Irish manufacturing facility rather than merely operating the facility as a division of B&L. Although it is possible that B&L could have established the Irish facility in a manner which resulted in a greater United States tax, it is axiomatic that a taxpayer is not obligated to arrange his affairs in a manner which maximizes his tax burden. *Seminole Flavor Co. v. Commissioner*, 4 T.C. 1215, 1235 (1945).[14] Thus respondent's determination must stand or fall based on the "clear reflection of income" prong of section 482.

As a preliminary matter, we must first address respondent's contention that it is inappropriate to analyze the transfer price and royalty rate used by B&L separately, on the theory that B&L and B&L Ireland would have constructed their relationship in a different manner had they been conducting their affairs at arm's length. Respondent argues that B&L would never have agreed to license its spin cast technology which allowed it to produce soft contact lenses for approximately $1.50 per lens and then purchase lenses from the licensee for $7.50 per lens. Respondent argues that B&L would have been unwilling to pay an independent third party much more than its costs would have been had it chosen to produce the contact lenses itself. He is indifferent as to whether the royalty is increased or the transfer price is decreased as long as the result is that B&L Ireland receives only its costs of production and a reasonable mark up. In essence, respondent argues that B&L Ireland was little more than a contract manufacturer the sale of whose total production was assured and who thus was not entitled to the return normally associated with an enterprise which bears the risk as to the volume of its product it will be able to sell and at what price.

---

[14]See also *Johnson Bronze Co. v. Commissioner*, T.C. Memo. 1965-281.

Respondent's argument would have some merit had we found that B&L was required to purchase B&L Ireland's production of soft contact lenses. In such a case, B&L Ireland would indeed have been a contract manufacturer in substance despite the fact that ostensibly the license agreement and product purchases were not interdependent. However, we have found as fact that no such purchase requirement existed. All of the documents generated by B&L in evaluating the feasibility of the Irish lens facility indicate that it was intended to serve the foreign markets with limited possible importation of Irish lenses into the United States in the event of production problems at the Rochester facility. That B&L would import substantial quantities of Irish lenses into the United States should worldwide demand not meet expectations was not guaranteed. Nor did B&L Ireland have a guarantee that the transfer price it received for its lenses would remain at $7.50 per lens. In actuality, the transfer price was reduced to $6.50 in 1983 due to market pressures. The most that can be said is that B&L Ireland had certain expectations as to the volume and price of lenses it could anticipate selling to B&L or its affiliates. However, such expectations are no different than those which any supplier has with regard to the business of a major customer and do not constitute a guarantee which effectively insulated B&L Ireland from market risks. In a case where the license of intangibles and sale of the product manufactured to the licensor were interdependent, then the separate royalty rate and transfer price would be unimportant as long as the net result is satisfactory. The same cannot be said in this instance where both the volume and price of sales to the licensor are subject to variation. The transfer price and the royalty rate each has independent significance and will thus be examined separately.

A. *Determination of Arm's-Length Prices Between Petitioner and B&L Ireland for Soft Contact Lenses*

Section 1.482-2(e)(1)(i), Income Tax Regs., provides that when one controlled entity sells tangible property to another controlled entity at "other than an arms's-length price," respondent has the authority to make appropriate

allocations between the seller and the buyer to reflect an arm's-length price for such sale. An arm's-length price is that price that an unrelated party would have paid under the same circumstances for the property involved in the controlled sale. Sec. 1.482-2(e)(1)(i), Income Tax Regs.

The same interests that controlled B&L unquestionably also had control over B&L Ireland. The basic prerequisite to respondent's allocation of income pursuant to section 482 is thus satisfied. We therefore turn to an examination of the $7.50 price per lens charged by B&L Ireland to petitioners during the years in question to determine whether it is a price at which such lenses would have been sold between unrelated parties dealing at arm's length.

The regulations set forth three specific methods for determining an arm's-length price for the sale of tangible property: the comparable-uncontrolled-price method, the resale-price method, and the cost-plus method. Sec. 1.482-2(e)(1)(ii), Income Tax Regs. The regulations further specify that use of the comparable-uncontrolled-price method is mandatory if comparable, uncontrolled sales of the tangible property in question exist. The resale-price method must be utilized if no comparable, uncontrolled prices exist and if the standards for its application are met. If all of the requirements for application of the resale-price method are not present, then either that method or the cost-plus method may be utilized depending upon which method is more feasible and is more likely to result in a more accurate estimate of an arm's-length price. Sec. 1.482-2(e)(1)(ii), Income Tax Regs. When none of the three methods specified above can be reasonably applied under the facts and circumstances of a particular case, the regulations authorize use of any other appropriate method of pricing. Sec. 1.482-2(e)(1)(iii), Income Tax Regs. The regulations offer no guidance in developing or applying such a "fourth" method. But see *DuPont v. United States*, 221 Ct. Cl. 333, 608 F.2d 445, 454-456 (1979).

Under the comparable-uncontrolled-price method, the arm's-length price of a controlled sale is equal to the price paid in comparable uncontrolled sales. Sec. 1.482-2(e)(2)(i), Income Tax Regs. Uncontrolled sales for purposes of application of the comparable-uncontrolled-price method in-

clude: (i) Sales made by the taxpayer to an unrelated party, (ii) purchases made by the taxpayer from unrelated parties, and (iii) sales made between two unrelated parties. Sec. 1.482-2(e)(2)(ii), Income Tax Regs. Controlled and uncontrolled sales are deemed comparable if the physical property and circumstances involved in the uncontrolled sales are identical to the physical property and circumstances involved in the controlled sales, or if such properties and circumstances are so heavily identical that they either have no effect on price, or can be measured and eliminated by making a reasonable number of adjustments to the price of uncontrolled sales. Some of the differences which may affect the price of property are differences in quality, terms of sale, intangible property associated with the sale, time of sale and the level of the market, and geographic market in which the sale takes place. Sec. 1.482-2(e)(2)(ii), Income Tax Regs.

The resale-price method arrives at an arm's-length price by measuring the value of the distribution function where a controlled taxpayer buys goods from a related supplier and sells them to unrelated buyers. Use of the resale-price method is inappropriate if the buyer/reseller has added more than an insubstantial amount to the value of the property by physically altering the product before resale or by the use of intangible property. Sec. 1.482-2(e)(3)(ii), Income Tax Regs. An arm's-length price is determined by subtracting an appropriate markup from the resale price at which the property purchased in the controlled sale is resold in an uncontrolled sale. An appropriate markup is the gross profit (expressed as a percentage of sales) that would be earned by the buyer/reseller on the sale of property that is both purchased and resold in uncontrolled transactions "most similar" to the resale of property purchased in the controlled sale. In determining the appropriate markup, adjustments must be made for differences between the uncontrolled purchase and resale and the controlled purchase and uncontrolled resale if those differences have a definite and reasonably ascertainable effect on price. The regulations identify the following factors as important in evaluating the similarity of resales: (1) The types of property sold; (2) the functions performed by the reseller with respect to the

property (i.e., packaging, labeling, maintenance of inventory, minor assembly, advertising, selling at wholesale or retail, billing, maintenance of accounts receivable, and servicing); (3) the effect on price of any intangible property used by the seller; and (4) the geographic market in which the seller operates. Sec. 1.482-2(e)(3)(vi), Income Tax Regs.

The cost-plus method is primarily applicable to sales of goods to which the controlled seller has added substantial value. Sec. 1.482-2(e)(4), Income Tax Regs. An arm's-length price is derived by adding an appropriate gross profit percentage to the controlled seller's cost of production. The cost of production is computed in accordance with sound accounting practices consistently applied. The appropriate gross profit percentage is equal to the gross profit percentage (expressed as a percentage of cost) earned on uncontrolled sales of property most similar to the uncontrolled sales in issue. Similarity for this purpose is determined in the same manner as under the resale-price method. Adjustments are required for differences between comparable uncontrolled sales and the controlled sale if those differences have a definite and reasonably ascertainable effect on price. If similar sales are not available, the prevailing gross profit percentages in the particular industry may be appropriate. Sec. 1.482-2(e)(4)(iv), Income Tax Regs.

Petitioners contend that they have presented ample evidence of comparable, uncontrolled sales of soft contact lenses which establish that the $7.50 per lens price charged by B&L Ireland to B&L was at or below the price which would have been charged by uncontrolled manufacturers to distributors for similar lenses.[15] Specifically, petitioners point to sales to distributors by Lombart, American Hydron, American Optical, and Hydrocurve of soft contact lenses during 1980 through 1982. No sale cited by petitioner took place for a price less than the $7.50 charged by B&L Ireland. Alternatively, petitioners argue that application of the resale-price method to the facts of this case lends further support to the arm's-length nature of the $7.50 transfer price.

---

[15]Proof that B&L Ireland's $7.50 price was less than an arm's-length price would be beneficial to petitioners inasmuch as respondent argues that the price charged by B&L Ireland was too high, thus allowing petitioners to shift too much income to B&L Ireland.

Respondent contends that neither the comparable-uncontrolled-price or resale-price methods are applicable herein. He argues that the sales by manufacturers to distributors cited by petitioners on the one hand, and the sales by B&L Ireland to B&L on the other, are not sufficiently similar to function as comparables. He also urges that dissimilarities between B&L and the distributors cited by petitioners render inappropriate reference to the markup percentages of these distributors in application of the resale-price method.

Specifically, respondent urges that the disparities in the volumes of lenses sold by B&L Ireland to B&L and those purchased by independent distributors from manufacturers indicate that these distributors and B&L operated at different levels of the market. He hypothesizes that any distributor who purchased lenses in the quantities purchased by B&L from B&L Ireland would have demanded and received significant volume discounts in purchase price.

The second distinction respondent finds significant is that whereas B&L was an integrated manufacturer and distributor of soft contact lenses with a worldwide sales and marketing force and a substantial research and development function, the distributors cited by petitioners performed only distribution functions. Respondent hypothesizes that at arm's length B&L would not be willing to pay as much for soft contact lenses as other distributors since, unlike non-integrated distributors, it needed the profit from soft contact lens sales to support these additional functions.

Finally, respondent urges that it is inconceivable that at arm's length B&L, which possessed the technology and present ability to manufacture contact lenses at a cost far below that achievable by any of its competitors, would go into the open market and pay $7.50 per lens for a product it could produce itself for approximately $1.50 even though other distributors without this capability would consider the $7.50 a market price.

Although he never explicitly says so, respondent contends that the cost-plus method is the only proper method for determination of the price B&L would have paid for B&L Ireland soft contact lenses at arm's length. Based on the testimony of his economic expert, Dr. David Bradford,

respondent determined that an arm's-length price would be "in the neighborhood" of $2.25 to $3 per lens. Dr. Bradford based his conclusion on his finding that B&L produced 7.1 million lenses in 1981 at a cost of $1.50 per lens. He studied the gross profit margins of several soft contact lens manufacturers, most notably NPDC, Danlex Corp., and the Amsco/Lombart division of the American Sterilization Co. and found that these companies employed gross markups ranging from 22 to 141 percent. Applying this gross markup to B&L's production costs, Dr. Bradford determined that an arm's-length price would be $1.82 to $3.62. He further posited that the quantities purchased by B&L and the fact that the hypothetical manufacturer would not have to support sales or research and development functions dictated a figure at the lower end of this range. He thus determined a 50-100 percent markup was most likely, resulting in a lens price of between $2.25 and $3.

We have found as fact that B&L functioned as a distributor with respect to lenses it purchased from B&L Ireland. We fail to see the significance of the fact that B&L engaged in other functions in addition to distribution with respect to soft contact lenses. We have also found that daily wear soft contact lenses of any manufacturer are generally considered a fungible commodity. Therefore, the third party purchase agreements identified by petitioner qualify as comparable-uncontrolled-sales for purposes of application of the comparable uncontrolled price method. However, these sales differ from those of B&L Ireland to B&L in that the buyers, unlike B&L, were not required to pay an additional $0.62 of duty and freight charges on their purchases. We therefore must reduce the sales prices identified by petitioner by $0.62 in order to make those transactions comparable to the sales at issue.

After giving effect to the above adjustment, we find that use of the comparable-uncontrolled-price method of determining an arm's-length price is mandatory. The third-party transactions identified by petitioner provide ample evidence that the $7.50 per-lens price charged by B&L Ireland is equal or below prices which would be charged for similar lenses in uncontrolled transactions.

Only the Lombart agreements which contain separate prices for standard and thin lenses suggest a market price below the $7.50 plus freight and duty charged by B&L Ireland. However, we place more weight on the Lombart agreements which, similar to B&L Ireland pricing, charge a single price for either standard or thin lenses. The $8.50 charged by Lombart, less the $0.62 adjustment described above exceeds the $7.50 charged by B&L.[16]

We place particular reliance on the Second Circuit's opinion in *U.S. Steel Corp. v. Commissioner,* 617 F.2d 942 (2d Cir. 1980), revg. T.C. Memo. 1977-190. We are constrained to follow Second Circuit precedent since that circuit is where an appeal of this decision would lie. See *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

*U.S. Steel Corp.* involved the prices charged the taxpayer by its wholly owned subsidiary, Navios, for transporting iron ore from Venezuela to the United States. Although U.S. Steel was by far Navios' largest customer, Navios also transported significant amounts of ore from Venezuela to the United States for unrelated parties at the same price it charged U.S. Steel. This Court refused to accept these uncontrolled sales as comparables for purposes of applying the comparable-uncontrolled-price method because the unrelated parties with whom Navios did business, unlike U.S. Steel, did not have a continuing relationship with Navios for the transportation of over 10 million tons of ore per year. *U.S. Steel Corp. v. Commissioner,* T.C. Memo. 1977-190, revd. 617 F.2d 942 (2nd Cir. 1980). In other words, at arm's length Navios would have charged a lower price to U.S. Steel than to other customers in order to retain U.S. Steel as a high volume, long-term customer. The Second Circuit reversed on the ground that Navios' transactions with uncontrolled parties were sufficiently comparable to permit application of the comparable-uncontrolled-price method stating:

---

[16]Even the Lombart agreements, which charge $7.50 for standard lenses and $8.45 for thin lenses, do not support a finding that a uniform price of $7.50 is other than a market price. The average of these two prices is $7.98. When reduced by the $0.62 adjustment described above, this equals $7.36. Although this amount is lower than the $7.50 charged by B&L Ireland, the variance is so small (less than 2 percent) as to be insignificant and cannot support a finding that B&L Ireland's price was excessive, especially when examined in light of the other agreements identified by petitioner.

We think it is clear that if a taxpayer can show that the price he paid or was charged for a service is "the amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties" it has earned the right, under the Regulations, to be free from section 482 reallocation despite other evidence tending to show that its activities have resulted in a shifting of tax liability among controlled corporations. Where, as in this case, the taxpayer offers evidence that the same amount was actually charged for the same service in transactions with independent buyers, the question resolves itself into an evaluation of whether or not the circumstances of the sales to independent buyers are "similar" enough to sales to the controlling corporation under the circumstances "considering all relevant facts." * * * [*U.S. Steel Corp. v. Commissioner*, 617 F.2d at 947.]

The Second Circuit rejected this Court's position that the standard against which the rate paid by U.S. Steel should be measured is what a reasonable charge would be for a continuing relationship involving the transportation of more than 10 million tons of iron ore per year stating:

To say that [the independent importer] was buying a service from Navios with one set of expectations about duration and risk, and Steel another, may be to recognize economic reality; but it is also to engraft a crippling degree of economic sophistication onto a broadly drawn statute which—if "comparable" is taken to mean "identical," as Judge Quealy would read it—would allow the taxpayer no safe harbor from the Commissioner's virtually unrestricted discretion to allocate. [*U.S. Steel Corp. v. Commissioner*, 617 F.2d at 951.]

We find that the purchases of contact lenses by B&L from B&L Ireland present an analogous situation. To posit that B&L, the world's largest marketer of soft contact lenses, would be able to secure a more favorable price from an independent manufacturer who hoped to establish a long-term relationship with a high volume customer may be to recognize economic reality, but to do so would cripple a taxpayer's ability to rely on the comparable-uncontrolled-price method in establishing transfer pricing by introducing to it a degree of economic sophistication which appears reasonable in theory, but which defies quantification in practice.

Although *U.S. Steel* dealt with the performance of services, we see no reason why its rationale should not also apply to other aspects of section 482, including the sale of tangible property. Nor do we find significant the fact that

the comparables in *U.S. Steel* were transactions by the taxpayer with unrelated purchasers, whereas the comparables here do not involve petitioner. The regulations identify both situations as potentially giving rise to comparable uncontrolled prices. See sec. 1.482-2(e)(2)(ii), Income Tax Regs.

Respondent's argument that the disparities in the volumes of lenses purchased by B&L from B&L Ireland on the one hand and the purchases petitioner claims are comparable on the other, render the two incomparable is unpersuasive. Although many of the manufacturers cited by petitioners offered volume discounts to large volume purchasers, there is no evidence of any manufacturer's offering discounts for annual purchases in excess of 75,000 units. It is unrealistic to presume, as does respondent, that comparable discounts would be given for purchases above this level. Manufacturers presumably give volume discounts since high volumes allow them to spread their fixed manufacturing costs over more units and thus allow them to attain lower unit costs of production. At some point, however, the economies of scale achievable through increased production will begin to diminish and a manufacturer's unit production costs will approach an irreducible minimum.

The market price for any product will be equal to the price at which the least efficient producer whose production is necessary to satisfy demand is willing to sell. During 1981 and 1982, the lathing methods were still the predominant production technologies employed in the soft contact lens industry. American Hydron, an affiliate of NPDC and a strong competitor in the contact lens market, was able to produce 466,348 and 762,379 soft contact lenses using the lathing method in 1981 and 1982, for $6.18 and $6.46 per unit, respectively. It is questionable whether any of B&L Ireland's competitors, save B&L, could profitably have sold soft contact lenses during the period in issue for less than the $7.50 charged by B&L Ireland. The fact that B&L Ireland could, through its possession of superior production technology, undercut the market and sell at a lower price is irrelevant. Petitioners have shown that the $7.50 they paid for lenses was a "market price" and have thus "earned the

right to be free from a section 482 reallocation." *U.S. Steel Corp. v. Commissioner, supra* at 947.

Finally, respondent argues that B&L *could have* produced the contact lenses purchased from B&L Ireland itself at lesser cost. However, B&L *did not* produce the lenses itself. The mere power to determine who in a controlled group will earn income cannot justify a section 482 allocation of the income from the entity who actually earned the income. *Bush Hog Manufacturing Co. v. Commissioner,* 42 T.C. 713, 725 (1964); *Polak's Frutal Works, Inc. v. Commissioner,* 21 T.C. 953, 976 (1954). B&L Ireland was the entity which actually produced the contact lenses. Respondent is limited to determining how the sales to B&L by B&L Ireland would have been priced had the parties been unrelated and negotiating at arm's length. We have determined that the $7.50 charged was a market price. We thus conclude that respondent abused his discretion and acted arbitrarily and unreasonably in reallocating income between B&L and B&L Ireland based on use of a transfer price for contact lenses other than the $7.50 per lens actually used. When conditions for use of the comparable-uncontrolled-price method are present, use of that method to determine an arm's-length price is mandated. Sec. 1.482-2(e)(1)(ii), Income Tax Regs. Therefore, we need not consider petitioner's alternative position—that application of the resale-price method supports the arm's-length nature of the $7.50 transfer price. We note, however, that application of such method lends further support to the arm's-length nature of B&L Ireland's $7.50 sales price. Uncontrolled purchases and resales by American Optical, Southern, Bailey-Smith, and Mid-South indicate gross profit percentages of between 22 and 40 percent were common among soft contact lens distributors. This is confirmed by the testimony of Thomas Sloan, president of Southern, who testified that he tried to purchase lenses from manufacturers at prices which allowed Southern to maintain a reasonable profit margin of between 25 and 40 percent. Applying a 40-percent gross margin to B&L's average realized price of $16.74 and $15.25 for domestic sales in 1981 and 1982, respectively, indicates a lens cost of $10.04 and $9.15, respectively—well above the

$7.50 received by B&L Ireland for its lenses and also above the $8.12 cost to B&L when freight and duty are added.

B. *Determination of Arm's-Length Royalty Payable by B&L Ireland for Use of B&L's Intangibles*

We next address the adequacy of the royalty charged by B&L to B&L Ireland for use of its patent rights, technology, and trademarks as they relate to the production and sale of soft contact lenses. The license agreement entered into by B&L and B&L Ireland, effective January 1, 1981, requires B&L Ireland to pay to B&L 5 percent of the net sales proceeds from the sale of any products manufactured by B&L Ireland using any of B&L's patent rights or technology, or marketed under B&L's trademarks. None of the experts were of the opinion that the license agreement as written constitutes arm's-length consideration to B&L for license of its intangibles. Petitioners maintain that 5 percent is the proper royalty percentage, but now contend that the 5 percent should be applied to the average realized price (ARP) of B&L and its subsidiaries from the sale of B&L Ireland contact lenses to third parties (contended to be $16.74 in 1981 and $15.25 in 1982 for domestic sales, and $22.43 in 1981 and $18.10 in 1982 for foreign sales).

Section 1.482-2(d), Income Tax Regs., provides a framework for determining an arm's-length consideration for the transfer, sale, assignment, or loan of intangible property or an interest therein between related entities. "Arm's-length consideration" is specifically defined as "the amount that would have been paid by an unrelated party for the same intangible property under the same circumstances." Sec. 1.482-2(d)(2)(ii), Income Tax Regs. The best evidence of such arm's-length consideration is the amount actually paid by unrelated parties for the same or similar intangible property under the same or similar circumstances. In the absence of sufficiently similar transactions involving an unrelated party, section 1.482-2(d)(2)(iii), Income Tax Regs., lists the following factors as relevant in determining the amount of an arm's-length consideration:

(a) The prevailing rates in the same industry or for similar property,
(b) The offers of competing transferors or the bids of competing transferees,

(c) The terms of the transfer, including limitations on the geographic area covered and the exclusive or nonexclusive character of any rights granted,

(d) The uniqueness of the property and the period for which it is likely to remain unique,

(e) The degree and duration of protection afforded to the property under the laws of the relevant countries,

(f) Value of services rendered by the transferor to the transferee in connection with the transfer within the meaning of paragraph (b)(8) of this section,

(g) Prospective profits to be realized or costs to be saved by the transferee through its use or subsequent transfer of the property,

(h) The capital investment and starting up expenses required of the transferee,

(i) The next subdivision is (j),

(j) The availability of substitutes for the property transferred,

(k) The arm's-length rates and prices paid by unrelated parties where the property is resold or sublicensed to such parties,

(l) The costs incurred by the transferor in developing the property, and

(m) Any other fact or circumstance which unrelated parties would have been likely to consider in determining the amount of an arm's-length consideration for the property.

Petitioners primarily rely on the expert testimony of Professor Irving H. Plotkin as support for their position that a royalty of 5 percent of ARP constitutes an arm's-length consideration to B&L for the license of its intangibles. Professor Plotkin's report relies upon and is supplemented by the expert report of petitioner's contact lens industry expert, Dr. Irving J. Arons, and pro forma financial statements of B&L and B&L Ireland prepared for 1981 and 1982 by the public accounting firm of Price Waterhouse.

Professor Plotkin concurs with Dr. Arons' conclusion that a royalty rate of 5 percent of ARP was the standard licensing rate for licensing technology in the contact lens industry during the relevant years. Petitioners place great reliance on Dr. Arons' identification of the Vertical Spin Cast License Agreement between CAS and NPDC, and the 1979 CooperVision Agreement pursuant to which NPDC granted CooperVision a coexclusive license to use the ILC Cast Molding Process of soft contact lens production as comparable uncontrolled transactions which support a royalty of 5 percent of net sales as an appropriate royalty rate for the intangibles licensed to B&L Ireland. Professor

Plotkin also conducted a rate of return analysis in which he calculated B&L Ireland's rate of return on investment for production of contact lenses, and B&L's rate of return on the marketing and sale of Irish produced lenses. Using the pro forma financial data compiled by Price Waterhouse, Professor Plotkin determined that B&L Ireland earned a rate of return of 106 percent in 1982 compared to 66 percent for B&L with respect to their respective activities involving Irish lenses. He concluded that such a profit split accurately reflected the relative risks borne by each entity and further supported a royalty rate of 5 percent of ARP.

Respondent primarily relies on the expert reports of Dr. David Bradford and Dr. Clark Chandler to support his position that a royalty rate of between 27 and 33 percent of ARP would be necessary to adequately compensate B&L for the use of its intangibles by B&L Ireland.

Dr. Bradford first determined that B&L could have produced the lenses produced for it by B&L Ireland itself for $1.50 per lens. He then determined that an independent manufacturer would require a markup of between 50-100 percent to profitably produce lenses using the spin cast technology. He thus determined that B&L would have paid a maximum of $2.25 to $3 for lenses from an independent manufacturer using its spin cast technology.[17] He then determined the appropriate royalty by subtracting this maximum lens price from the $7.50 actually paid by B&L to arrive at a royalty of between $4.50 and $5.25 per lens.

Dr. Chandler's approach was to identify each of the discrete intangibles which he alleged B&L Ireland gained access to through the B&L License Agreement, and based on transactions involving similar intangibles and other criteria, determine what an independent contact lens manufacturer would be willing to pay, expressed as a percentage of ARP,[18] for use of such an intangible. The results of his analysis are as follows:

| Intangible | Low estimate | High estimate |
|---|---|---|
| Lens design and materials | 4% | 8% |
| FDA and other regulatory approval | 1 | 1 |

---

[17]$1.50 x 150% = $2.25
$1.50 x 200% = $3.00

[18]Dr. Chandler used figures for ARP of $17.88 in 1981 and $16.06 in 1982.

| Intangible | Low estimate | High estimate |
|---|---|---|
| Spin casting and related manufacturing processes | 19 | 22 |
| Trademarks and other marketing intangibles | 3 | 5 |
| Allocation of R.D. & E. costs | --- | 4 |
| | 27 | 40 |

Dr. Chandler determined that the maximum royalties arrived at by his estimates were obviously unrealistic given the $7.50 per lens transfer price utilized in 1981 and 1982, he therefore reduced his high end royalty rate to 33 percent of ARP.

We have closely examined the expert's reports and the clarifying testimony given at trial by each expert as to his respective report. We are not bound by the opinion of any expert when the opinion is contrary to our own judgment. We may embrace or reject expert testimony, whichever in our judgment is most appropriate. *Helvering v. National Grocery Co.*, 304 U.S. 282, 295 (1938); *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. We are not restricted to choosing the opinion of one expert over another, but may extract relevant findings from each in drawing our own conclusions. *Chiu v. Commissioner*, 84 T.C. 722, 734 (1985).

For the reasons stated below, we do not completely embrace the approach or results arrived at by any of the experts. We think, however, that petitioners have adequately demonstrated the unreasonableness of the royalty espoused by respondent. However, we are not required to approve or disapprove of respondent's allocation in toto. *G.D. Searle v. Commissioner*, 88 T.C. at 367; *Ach v. Commissioner*, 42 T.C. 114, 126-127 (1964); *Nat Harrison Associates Inc. v. Commissioner*, 42 T.C. 601, 617 (1964). We think the record also establishes that B&L would have received greater consideration for the license of its intangibles had B&L and B&L Ireland been independent and the royalty arrived at through arm's-length bargaining. We therefore draw upon elements of the expert reports and record as a whole to determine the royalty the parties would have negotiated under these circumstances.

We first must determine whether the record contains a sufficiently similar transaction to the B&L License Agreement involving an unrelated party. The royalty paid by an unrelated party for the same intangible property under the same circumstances should be the best indication of an arm's-length consideration. *Ciba-Ceigy Corp. v. Commissioner*, 85 T.C. at 223; sec. 1.482-2(d)(2)(ii), Income Tax Regs.

We cannot agree with petitioners' position that either the 1979 CooperVision Agreement or the Vertical Spin Cast License Agreement involve "the same or similar intangible property" as the transfer at issue in this case. See sec. 1.482-2(d)(2)(ii), Income Tax Regs. Both the cast molding process and the vertical spin cast process were relatively new technologies which had not yet proven susceptible to large volume commercial exploitation as of January 1, 1981, the date of the B&L Ireland License Agreement. There is no indication in the record as to the extent ILC, the original developer of the technology, or American Optical were able to commercially exploit the technology during the late 1970s. FDA approval to market soft contact lenses manufactured using the cast molding process was not obtained by NPDC until 1980 despite having received the license to such technology in February 1977. Significant use of the process by NPDC in production of soft contact lenses did not commence until 1981. Thus there is no evidence that any company was using the cast molding process successfully on a commercial basis at the time B&L and B&L Ireland entered into their license agreement on January 1, 1981.

Similarly, NPDC did not obtain FDA approval to market soft contact lenses manufactured using the vertical spin cast process it licensed in July 1981 until September 1984. Although the license agreement recites that CAS was engaged in commercial production of contact lenses using the vertical spin cast technology, there is no evidence in the record as to the extent of CAS's commercial operations, the yields they were experiencing using the process, or the costs of production experienced by CAS.

In contrast, at the time the B&L Ireland License Agreement was entered into, the spin cast technology used by B&L had been successfully used to produce soft contact

lenses on a commercial basis since 1971. Only B&L had been able to successfully mass produce soft contact lenses in the United States using the spin cast process. The spin cast process was the most efficient production process then in use. B&L's effective monopoly in use of the spin cast process in the United States enabled it to enjoy significant savings in production costs over those incurred by any of its competitors.

We thus conclude that the intangible property encompassed in B&L's spin cast technology was superior to that existing on January 1, 1981, with respect to either the cast molding process or the vertical spin cast process. Neither of these technologies had successfully been shown to be commercially feasible over an extended period of time as had the B&L spin casting technology. Each then would have been viewed as significantly riskier technology for a potential licensee to invest in at that time than the proven spin cast technology of B&L. This risk is heightened if the licensee is, as was B&L Ireland, a start up company with no prior experience in the soft contact lens industry. In contrast, CooperVision and NPDC both had experience in the industry at the time they entered their respective license agreements. Both therefore would be expected to be less reticent in committing to the development of unproven yet potentially productive technologies. In contrast, a start-up company with no experience in the field would be expected to opt for a proven technology. Under the circumstances, we would not think that either the cast molding process or vertical spin cast process would be considered an appropriate technology for an independent manufacturer in the position of B&L Ireland.

We also note that terms of the 1979 CooperVision Agreement may have been influenced by the precarious financial position in which NPDC found itself at the time of the agreement. The agreement was structured so that NPDC received a $1 million license fee up front with an additional $1 million payable at the rate of $4 per lens sold for the first 250,000 lenses sold by CooperVision. This royalty structure was designed to give NPDC a quick infusion of much needed cash, and also had the effect of creating more risk for the licensee than would a more traditional licensing

arrangement in which royalties are payable uniformly as the licensee makes sales of products produced with the licensed technology. A licensee would demand a lower overall royalty rate than he would be willing to pay under normal circumstances to compensate him for assumption of this additional risk. In the instant case, there is no evidence in the record that B&L had similar urgent cash needs which would place it in such a weakened bargaining position visà vis a potential licensee.

Finally, we note that CAS, the licensor in the Vertical Spin Cast License Agreement, was not in a position to exploit its technology in the United States. The Czechoslovakian organization had no sales or marketing function in place in the United States and was generally unfamiliar with the market dynamics of capitalist societies. It therefore needed to form an alliance with someone who had the capability itself to fully exploit its spin cast technology. In contrast, B&L had both the technology and a network of affiliated sales corporations able to market the products produced with this technology. Thus B&L would have found itself in a much stronger bargaining position in a hypothetical negotiation with B&L Ireland than would have CAS in its negotiations with NPDC.

We thus conclude that the intangible property embodied in the 1979 CooperVision Agreement and the Vertical Spin Cast Licensing Agreement differed from that embodied in the B&L Ireland License Agreement. Additionally, the circumstances under which the former two agreements were negotiated differed significantly from the circumstances of B&L and B&L Ireland at the time they entered their license agreement. See sec. 1.482-2(d)(2)(ii), Income Tax Regs. We thus refuse to rely on either agreement as evidence of an arm's-length consideration for the intangibles licensed by B&L to B&L Ireland.

Having found that the record does not contain a sufficiently similar transaction involving an unrelated party, we must attempt to construct an arm's-length royalty. In doing so, we look to the relevant factors identified by section 1.482-2(d)(2)(iii), Income Tax Regs., for guidance.

Section 1.482-2(d)(2)(iii)(g) and (h), Income Tax Regs., provides that we may consider the "prospective profits to

be realized * * * by the transferee through its use * * * of the property" and "the capital investment and starting up expenses required of the transferee." The best indication of the prospective profits to be anticipated through use of the spin cast technology by an Irish manufacturing facility and the capital investment required to generate these profits are the projections actually prepared by B&L for the purpose of determining the feasibility of such a facility, as well as the actual proposals submitted to the IDA. Unlike both respondent and petitioners' experts, we find little relevance in B&L Ireland's actual results of operations during 1981 and 1982. Such information would not have been available in 1980 to a potential licensee negotiating a license agreement which was entered on January 1, 1981. The arm's-length nature of an agreement is determined by reference only to facts in existence at the time of the agreement. *R.T. French Co. v. Commissioner*, 60 T.C. 836, 852 (1973). Rather, we place heavy reliance on the Special Expenditure Application (SEA) dated October 15, 1980, the various documents prepared by B&L to determine the feasibility of the proposed Irish lens manufacturing facility, and the actual proposal submitted to the IDA. These documents all contain various projections of earnings to be generated by the Irish lens manufacturing facility. These projections were intended to serve as financial justification to B&L management and the IDA of the capital investment to be made in development of the facility.

The capital cost of developing the Irish lens manufacturing facility was estimated in the SEA to be $9,570,000, including $2,718,000 of leased capital assets. Acquisition of nonleased capital assets would occur during 1980 and 1981 and would be financed as follows:

|  | *1980* | *1981* | *Total* |
|---|---|---|---|
| B&L Ireland capital stock | $213,000 | - - - | $213,000 |
| B&L intercompany loan | [19]5,489,000 | ($1,933,000) | 3,556,000 |
| IDA grant | - - - | 3,083,000 | 3,083,000 |
|  | 5,702,000 | 1,150,000 | 6,852,000 |

[19]Of this amount, $1,933,000 of the initial B&L loan was to be interim financing to cover the expected 3-month lag between acquisition of assets and disbursement of grant funds by the IDA.

The leased assets could be obtained under favorable lease terms since the lessor was entitled to IDA grants of 45 percent of their $2,718,000 cost ($1,223,000). In addition to the capital costs described above, the SEA projections also indicated that $1,511,000 of section 84 financing would be obtained in 1980 to provide working capital and to finance start-up costs. The SEA therefore projects a B&L Ireland investment of $8,363,000 capital assets and working capital in order to generate the earnings projected through operation of the proposed Irish lens manufacturing facility.[20] We thus focus our inquiry on the earnings an independent entrepreneur would have required as an inducement to risk this level of assets to a lens manufacturing venture using the B&L spin cast technology.

The best indication in the record of the earnings such a hypothetical investor would hope to generate are the 10-year earnings and cash-flow projections contained in the October 15, 1980, Special Expenditure Application. This document was generated closest in time to the license agreement and would thus appear to be the most up-to-date information available prior to the date of the license. However, we feel that a prudent investor would have adjusted these projections in several important respects before using them as a basis for determining the price at which he would be willing to enter into a royalty arrangement with B&L for use of its intangibles.

First, the earnings projection assumes that the Irish facility would be operating at or near full capacity by 1983 and that it would be able to sell almost all of its production from that year through 1989. We think this is an unreasonable assumption with respect to years 1986 through 1989. B&L's 1980 strategic plan projected substantial increases in international demand for soft contact lenses in years 1981 through 1985. Thus the increasing projected sales by the Irish facility through 1985 appear reasonable. However, there is no support for the assumption that the Irish plant would have been able to operate at full capacity in years 1986 through 1989. To the contrary, the Stage II financial

---

[20]Capital assets...........................................................$6,852,000
Working capital .......................................................1,511,000
8,363,000

evaluation of the proposed Irish manufacturing facility prepared by the overseas task force indicated that the members of the task force anticipated an erosion in the demand for both standard and thin lens sales as prolonged wear lenses made of new materials became available. Although the license agreement entitles B&L Ireland to share in any technological or product advancements made by B&L, the fact that the agreement is terminable by either party at will makes this provision of limited value. We believe a prudent investor would have factored into his investment analysis the assumption that the reduced demand for HEMA daily wear soft lenses would have precluded sale of the facility's full production capacity during the later years of its useful life. Using our best judgment, we believe an assumption of steady erosion in demand to 80 percent of capacity in 1986, 60 percent in 1987, 40 percent in 1988, and 20 percent in 1989 is reasonable and would have been utilized by an independent investor. We will thus adjust the SEA projections accordingly.

Second, the SEA projections assume that the unit selling price for lenses produced at the Irish facility would be $7.50 throughout each of the years of projected operation. Such an assumption ignores the probability that lower cost competitors would enter the market and that new contact lens products would be developed which both would exert downward pressure on the price the Irish facility could be expected to receive for its HEMA, daily wear soft lenses. This probability was recognized in the Irish lens facility financial statements prepared January 24, 1980, for presentation to the IDA which presume a reduction in the $7.50 per unit sales price to $6.50 in 1983, with $0.50 reductions in each year thereafter. We find such an assumption reasonable and will adjust the later-generated SEA data accordingly.

Incorporating these adjustments into the SEA projections, we arrive at the following projected earnings from operation of the lens facility before reduction for payment of any royalty for use of B&L's intangibles. It is the division of these projected earnings between the licensor and licensee of the intangibles which the parties to the license agreement would seek to accomplish through setting of the royalty rate.

Schedule A
B&L Ireland
Earnings Projections—Pre-Technology Royalty
(000s omitted)

| | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|---|---|---|---|---|
| Units sold | --- | 1,000 | 2,100 | 3,100 | 3,200 | 3,225 | 2,580 | 1,935 | 1,290 | 645 |
| $/unit | --- | 7.50 | 7.50 | 6.50 | 6.00 | 5.50 | 5.00 | 4.50 | 4.00 | 3.50 |
| Sales | --- | 7,500 | 15,750 | 20,150 | 19,200 | 17,738 | 12,900 | 8,708 | 5,160 | 2,258 |
| Cost of sales[21] | | | | | | | | | | |
| Standard cost | --- | 2,570 | 5,397 | 7,967 | 8,224 | 5,869 | 4,992 | 4,115 | 3,237 | 2,360 |
| Start up/variance | 531 | 1,406 | 2,222 | 1,888 | --- | --- | --- | --- | --- | --- |
| Total cost of sales | 531 | 3,976 | 7,619 | 9,855 | 8,224 | 5,869 | 4,992 | 4,115 | 3,237 | 2,360 |
| Gross profit | (531) | 3,524 | 8,131 | 10,295 | 10,976 | 11,869 | 7,908 | 4,593 | 1,923 | (102) |
| Operating expenses[22] | 700 | 970 | 1,716 | 2,176 | 2,176 | 2,176 | 1,741 | 1,306 | 870 | 435 |
| Operating earnings (pre-royalty) | (1,231) | 2,554 | 6,415 | 8,119 | 8,800 | 9,693 | 6,167 | 3,287 | 1,053 | (537) |
| Other income/expense | | | | | | | | | | |
| Amortization of grants | --- | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 308 |
| Interest expense | (105) | (342) | (153) | (21) | --- | --- | --- | --- | --- | --- |
| Total other income/expense | (105) | (34) | 155 | 287 | 308 | 308 | 308 | 308 | 308 | 308 |
| Net earnings (pre-royalty) | (1,336) | 2,520 | 6,570 | 8,406 | 9,108 | 10,001 | 6,475 | 3,595 | 1,361 | (229) |

[21]The Jan. 24, 1980, Irish Lens Facility Financial Statements indicate that the variable manufacturing costs of producing HEMA soft contact lenses was projected at $1.36 per lens with the remaining manufacturing costs fixed. Absent any evidence to the contrary, we employ the same assumptions in adjusting the manufacturing costs of 1986 through 1980 for the hypothesized lower levels of production. Thus, $1,483 of the manufacturing costs in 1986 through 1989 are fixed and variable costs of sales are calculated at $1.36 per unit.

[22]Operating expenses in the years 1986 through 1989 are reduced from the figures appearing in the SEA earnings statement in the same proportion as are unit sales.

Despite petitioner's concession in this regard, we do not think that independent parties negotiating at arm's length would arrive at a royalty based on ARP. The purpose of the license agreement is to divide the income earned through exploitation of the licensed intangibles between the licensor and licensee. In this case, the income earned through exploitation of the licensed intangibles is the price B&L Ireland received from the sale of products produced using the licensed technology. The fact that the purchaser of the product also happens to be the licensor of the technology used to produce the product is irrelevant as long as the purchaser pays a market price. Therefore the price realized by B&L on its resale of lenses to nonaffiliates is of no consequence. We think an arm's-length royalty would be based on the price which the licensee is able to realize through sale of products produced using the licensed technology. Basing the royalty rate on this amount has the effect of varying the amount of royalty payable based on the amount of income the licensee is able to generate through use of the license and thus more accurately effectuates the parties' purpose in entering into the agreement. We will thus construct a royalty rate which is a percentage of the price B&L Ireland could expect to earn from lens sales.

In dollar terms, the lowest estimate by either Dr. Chandler or Dr. Bradford of the amount of royalty which would constitute an arm's-length consideration in 1981 or 1982 for the intangibles licensed by B&L to B&L Ireland is $4.33 per lens sold.[23] This translates to a royalty rate of just under 58 percent of the $7.50 price at which B&L Ireland sold lenses to B&L during those years. The unreasonableness of respondent's contention that a royalty of such magnitude constitutes an arm's-length consideration for use of B&L's intangibles is amply apparent when deducted from the previously constructed results of operations which a prudent investor in B&L Ireland's position could reasonably have expected to realize from use of the licensed intangibles:

---

[23]$16.06 ARP in 1982 per Dr. Chandler times his low end estimate of the royalty rate of 27 percent.

Schedule B
B&L Ireland
Operating Earnings Projection
57% Technology Royalty
(000s omitted)

| | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating earnings (Pre-royalty) (From Schedule A) | (1,231) | 2,554 | 6,415 | 8,119 | 8,800 | 9,693 | 6,167 | 3,287 | 1,053 | (537) |
| Royalty (57% of transfer price) | - - - | (4,275) | (8,978) | (11,485) | (12,064) | (10,111) | (7,353) | (4,964) | (2,941) | (1,287) |
| Adjusted earnings | (1,231) | (1,721) | (2,563) | (3,336) | (3,264) | (418) | (1,186) | (1,677) | (1,888) | (1,824) |

Obviously, no independent party would enter into an agreement for the license of intangibles under circumstances in which the royalty charged would preclude any reasonable expectation of earning a profit through use of the intangibles. We therefore find respondent's section 482 allocation with respect to the royalty to be arbitrary, capricious, and unreasonable.

Our rejection of the royalty rate advocated by respondent does not, however, require that we accept that proposed by petitioners. *G.D. Searle v. Commissioner,* 88 T.C. at 367. Both Dr. Arons and Dr. Plotkin testified that in their opinion a royalty of 5 percent of the transfer price charged for the contact lenses sold by B&L Ireland was inadequate as arm's-length consideration. On brief, petitioners recalculated the royalty due from B&L Ireland based on 5 percent of the average realized price (ARP) of Irish-produced lenses, arriving at royalties of $1,072,522 and $3,050,028 for 1981 and 1982, respectively.[24] This translates to a royalty of $0.9611 and $0.8257 per lens in 1981 and 1982, respectively. As stated previously, we do not consider ARP to be an appropriate base on which to calculate the royalty due. The fact that the royalty per unit payable in 1981 and 1982 declined despite the fact that B&L Ireland earned the same $7.50 per lens in each year is further evidence that a royalty based on ARP is inappropriate. Expressed as a percentage of the $7.50 transfer price received by B&L Ireland, the royalty conceded by petitioners is 12.81 and 11.01 percent in 1981 and 1982, respectively. Using the same analysis as was applied to respondent's royalty, we

---

[24]Computed as follows:

### 1981

| Reseller | Units | | Per lens ARP | | Royalty rate | | Royalty amount |
|---|---|---|---|---|---|---|---|
| B&L | 680,106 | x | $17.15 | x | .05 | = | $583,191 |
| Foreign affiliates | 436,345 | x | 22.43 | x | .05 | = | 489,361 |
| | 1,116,451 | | | | | | 1,072,552 |

### 1982

| Reseller | Units | | Per Lens ARP | | Royalty rate | | Royalty amount |
|---|---|---|---|---|---|---|---|
| B&L | 2,056,435 | x | $15.25 | x | .05 | = | $1,568,032 |
| Foreign affiliates | 1,637,565 | x | 18.10 | x | .05 | = | 1,481,996 |
| | 3,694,000 | | | | | | 3,050,028 |

find that even a royalty of 15 percent of the price received from the sale of products produced using the licensed intangibles is too low to constitute an appropriate arm's-length consideration in this case for use of the licensed intangibles. At a royalty of 15 percent of sales price, an investor in the position of B&L Ireland at the time the license agreement was being negotiated could have anticipated the following earnings through exploitation of the licensed intangibles:

As demonstrated by Schedule C, an investor in the Irish lens facility could expect an internal rate of return on investment of approximately 35 percent and could expect earnings from the first 3 years of operations to cover his initial $8,363,000 investment in the project. Over the life of the project, B&L would recover 37 percent of the operating earnings through the 15 percent royalty (16,405 ÷ 44,320). We consider such a result overly generous to B&L Ireland in light of the moderate level of risk to which it was exposed and the substantial discounts to projected earnings we have already incorporated into the forecasts.

In his expert report and at trial, Dr. Plotkin testified that as a rule of thumb a royalty rate generally divides net profits before royalties 25 to 75 percent between the licensor and licensee, respectively. See also *Ciba-Ceigy Corp. v. Commissioner*, 85 T.C. 172, 229 (1985). Even accepting this generalization, we think the B&L Ireland license agreement was unique and would have been an exception to the general rule had it been negotiated at arm's length. In the normal licensing situation, each party possesses something unique which is necessary for exploitation of a particular project. For example, one party may possess the production technology and the other possesses the capital and marketing expertise. A license agreement is negotiated since neither party possesses all of the attributes needed to exploit the product on its own. Here in contrast, B&L possessed both the production technology and the marketing network necessary to produce and sell soft contact lenses. B&L Ireland merely had the capital, a nonproprietory asset which theoretically could have been supplied by any number of entities. Thus, B&L Ireland would have found itself in a weaker bargaining position vis à vis B&L.

Schedule C
B&L Ireland
Operating Earnings Projection
15% Royalty
(000s omitted)

| | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating earnings Pre-royalty (From Schedule A) | (1,231) | 2,554 | 6,415 | 8,119 | 8,800 | 9,693 | 6,167 | 3,287 | 1,053 | (537) | 44,320 |
| Royalty—15% of transfer price | - - - | (1,125) | (2,362) | (3,023) | (2,880) | (2,661) | (1,935) | (1,306) | (774) | (339) | (16,405) |
| Operating earnings | (1,231) | 1,429 | 4,053 | 5,096 | 5,920 | 7,032 | 4,232 | 1,981 | 279 | (876) | 27,915 |
| Net present value of earnings discounted at 35 percent[25] | (1,231) | 1,058 | 2,224 | 2,071 | 1,782 | 1,568 | 699 | 242 | 25 | (59) | 8,379 |

[25]The internal rate of return on the project is derived by discounting the project's future earnings by the discount factor which results in the net present value of future earnings equaling the amount of investment. See generally, Anthony & Reece, Management Accounting 635-636 (5 ed. 1975). In this case, the net present value of future earnings approximated B&L Ireland's $8,363,000 investment when discounted at 35 percent. Normally discounted cash-flows, rather than earnings, are used in calculation of a project's internal rate of return. However, in situations such as this where, due to common control, there is no risk that earnings will not be ultimately realized in cash and the timing of such realization is within the discretion of the controlling party, we feel that use of earnings for measurement of the project's profitability is more appropriate.

Schedule D
B&L Ireland
Operating Earnings Projection
20% Royalty
(000s omitted)

| | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating earnings Pre-royalty (From Schedule A) | (1,231) | 2,554 | 6,415 | 8,119 | 8,800 | 9,693 | 6,167 | 3,287 | 1,053 | (537) | 44,320 |
| Royalty—20% of transfer price | . . . | (1,500) | (3,150) | (4,030) | (3,840) | (3,548) | (2,580) | (1,742) | (1,032) | (452) | 21,874 |
| Operating earnings | (1,231) | 1,054 | 3,265 | 4,089 | 4,960 | 6,145 | 3,587 | 1,545 | 21 | (989) | 22,446 |
| Net present value of earnings discounted at 27 percent | (1,231) | 830 | 2,024 | 1,996 | 1,907 | 1,860 | 855 | 290 | 3 | (115) | 8,419 |

and would have had to cede more of the profits from plant operations to B&L than the customary 25 percent. Using our best judgment, we find that at arm's length B&L Ireland would have been willing to invest in the lens production facility even if required to share approximately 50 percent of the profits therefrom with B&L as consideration for use of its intangibles. As illustrated in Schedule D, this equates to a royalty rate of 20 percent of net sales.

As Schedule D indicates, at a royalty rate of 20 percent of net sales an investor in the Irish lens facility could expect to generate sufficient net earnings to cover his $8,363,000 investment by early in his 4th year of operations. Over the course of the project, he could expect to generate an internal rate of return on this investment of approximately 27 percent. We can assume that the 12-percent rate used to discount future cash-flows in the SEA projections constituted petitioner's estimate of the acceptable rate of return on a relatively riskless venture. The additional 15 percentage points earned by the investor can thus be viewed as compensation for assuming the risks involved in the venture. Considering the proven, low-cost production technology to which B&L Ireland gained access via the licensing agreement, and its access to worldwide markets through its relationship with B&L, we consider the risks assumed by B&L Ireland to be moderate in comparison to those of other manufacturing ventures and the 15-percent premium to be wholly adequate to compensate B&L Ireland for assumption of these risks.

We thus hold that a royalty of 20 percent of B&L Ireland's sales price for soft contact lenses constitutes arm's-length consideration for use of B&L's intangibles. At arm's length B&L would thus have received royalties of $1,674,000 and $5,541,000 from B&L Ireland in 1981 and 1982, respectively.[26]

To give effect to the foregoing,

*Decision will be entered under Rule 155.*

---

[26]1981: 1,116,000 units x $7.50 x 20% = $1,674,000
1982: 3,694,000 units x $7.50 x 20% = $5,541,000